**William BUNDY et al.**

v.

**Joseph CANNON et al.**

**Johnny E. ADAMS et al.**

v.

**Joseph CANNON et al.**

**Civ. Nos. 70–486, 70–1363.**

United States District Court,
D. Maryland.
May 26, 1971.

Joseph Matera, Michael Millemann and Stephen H. Sachs, Baltimore, Md. (John Rupp and Stanley A. Bass, New York City, of counsel), for plaintiffs.

Francis B. Burch, Atty. Gen., of State of Md., Alfred J. O'Ferrall, III, and Henry J. Frankel, Asst. Attys. Gen., Baltimore, Md., for defendants.

Herbert J. Belgrad and Benjamin R. Civiletti, Baltimore, Md., amici curiae.

This opinion supersedes the interim opinion filed herein on March 2, 1971.

THOMSEN, District Judge.

In these cases, which have been consolidated for trial, 82 plaintiffs contend that the procedures under which they were transferred to the Maryland Penitentiary from the Sykesville Laundry Camp and the Maryland House of Correction and were kept in "segregated confinement"[1] and suffered other penalties, do not meet the due process standards guaranteed by the Fourteenth Amendment to the United States Constitution.[2]

There are two principal suits: (1) Bundy et al. v. Cannon et al., filed in April 1970 by ten plaintiffs against (a) the Commissioner of the Division of Correction of the Maryland Department of Public Safety and Correctional Services; (b) the Director of the Maryland Correctional Camp System; (c) the Captain of the Central Laundry Correctional Camp; and (d) the Warden of the Maryland Penitentiary, who recently resigned. (2) Adams et al. v. Cannon et al., filed in December 1970 by 72 plaintiffs against (a) the Commissioner; (b) the Deputy Commissioner; (c) the Warden of the Maryland House of Correction; and (d) the former Warden of the Penitentiary.[3]

In each case plaintiffs seek: (1) a declaratory judgment that the procedures followed violated their constitutional rights; (2) injunctive relief (a) releasing them from maximum security quarters, returning them to the institutions from which they were transferred to the Penitentiary, restoring to them all good time that was revoked, and placing them in the same status and position as they occupied prior to their transfer; (b) requiring defendants to follow specified procedures in all future disciplinary proceedings; and (c) other

---

[1]. The term "segregated confinement" means confinement in maximum security quarters in the South Wing of the Maryland Penitentiary, with the consequences set out in the Findings of Fact below.

[2]. Jurisdiction exists under 28 U.S.C. § 1343(3), which provides:

"The district court shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

" * * * *

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; * * * *"

See Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); Lee v. Washington, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968); Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968); Sewell v. Pegelow, 291 F.2d 196, 198 (4 Cir. 1961). Exhaustion of state legal or equitable remedies is not necessary. McNeese v. Board of Education, 373 U.S. 668, 672, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); Sostre v. McGinnis, 442 F.2d 178 (2 Cir. 1971); Rivers v. Royster, 360 F.2d 592, 594 (4 Cir. 1966).

[3]. During the pendency of this suit, the Warden of the Penitentiary resigned. The Commissioner and the Acting Warden then put into effect a number of changes in the conditions under which persons in segregated confinement in the Penitentiary are held, which mitigated the rigors of such confinement.

relief.[4] In their complaints plaintiffs also alleged that they had been subjected to cruel and unusual punishment under the Eighth Amendment, but pursuant to a stipulation of the parties filed herein on May 7, 1971, that issue has been dismissed without prejudice.

In each case plaintiffs state that they are suing on their own behalf and on behalf of others similarly situated. No effort to comply with the provisions of Rule 23(c), F.R.Civ.P., was made or suggested. It is clear, however, that the declaratory relief granted will benefit all persons similarly situated even though they are not made parties to these cases.

The same counsel represent all the plaintiffs, and two Assistant Attorneys General represent all the defendants. With the approval of counsel for all parties, the Court appointed Herbert J. Belgrad, Esq., and Benjamin R. Civiletti, Esq., as amici curiae.

A trial on the issue of procedural due process was held, at which many facts were stipulated, a representative number of the plaintiffs testified, and other evidence was received. Based thereon, the Court has made the following findings.

### Facts

The Correctional Camp Center is a minimum security institution. It is the headquarters for four satellite camps, including the Sykesville Laundry Camp. Work release and educational programs are available to inmates at these camp centers, and a weekend furlough program allows some prisoners to visit their homes.

The House of Correction is a medium security institution, with about 1,500 inmates. It has several industrial shops and training programs.[5]

The Maryland Penitentiary is a maximum security institution, which houses about 1,200 inmates.[6]

The south wing cell block of the Penitentiary, a 280 cell unit, is sometimes referred to as the "segregated confinement unit", sometimes as "maximum security quarters", and often simply as "the south wing". Confinement therein will be referred to as segregated confinement.[7] It is used to house men from the general Penitentiary population and men from other institutions who have been guilty of infractions of prison rules or are considered disciplinary problems. In a few instances men are transferred to segregated confinement for their own safety.

In segregated confinement the inmate is in a cell by himself, has little or no opportunity to communicate with other inmates, is issued distinctive clothing, receives his meals in his cell, has limited exercise and bathing opportunities, is more restricted in his visitation privileges than other inmates, and cannot participate in the work programs, education programs, job training programs, self-help groups, recreation programs and religious services available to the general population of the Penitentiary. The fact that men in segregated confinement are not allowed to work results in their inability to earn money and "industrial good time", which is credited at the rate of five days a month to inmates who work.

*Bundy case.* On January 29, 1970, eight of the ten plaintiffs in the Bundy case were transferred from the minimum security Laundry Camp to segregated

---

4. Plaintiffs originally claimed damages, but the claims for damages were withdrawn and plaintiffs now seek only declaratory and injunctive relief.

5. There are two other medium security institutions for men, the Correctional Training Center, for young men, and the Correctional Institution, for older men.

6. The rehabilitation scheme of the Department of Correction envisions an inmate progressing through the system to a minimum security assignment. The rate of parole increases as an inmate moves up the scale.

7. In some of the material issued by the Division of Correction, it is referred to simply as "confinement".

confinement quarters at the Penitentiary as a result of their claimed participation in a work stoppage which had occurred at the Laundry Camp on that day. On the next day, January 30, a disciplinary hearing was held before (1) a correctional officer at the Laundry Camp who had been involved in the incident and the resulting transfer, and (2) a classification officer in the correctional camp system. The eight plaintiffs were found to have incited and participated in a work stoppage. As a result of that finding substantial amounts of "good conduct time" which the several plaintiffs had earned were forfeited,[8] and they were placed on segregated confinement in the south wing of the Penitentiary for an indefinite period. Each of those plaintiffs served more than thirty days in segregated confinement and some as much as four months.

The disciplinary hearings were presided over by a correctional officer at the Laundry Camp who had been directly involved in the initial disturbance and was the officer who had recommended the removal of eight of the plaintiffs from the Camp to the Penitentiary.

None of the plaintiffs was given notice of the charges against him before the disciplinary hearings, nor notice of the time of his hearing until a few hours before it took place. They were not allowed representation or assistance at the hearings, nor were they allowed to present witnesses or other evidence except their own statements. They had no opportunity to question their accusers, since the only evidence presented at the hearings consisted of the written reports of correctional personnel.

Plaintiffs Robert Roberts and Robert White were not involved in the incidents at the Sykesville Laundry Camp. They were accused of forming an unauthorized inmate association at the Penitentiary and were found to have committed that violation in disciplinary proceedings held on March 5, 1970. As a result they were transferred from the general population of the Penitentiary to segregated confinement, and served substantial periods there. Their hearing was held before three correctional officers. The facts with respect to the hearing set out in the preceding paragraph apply also to their hearing.

*Adams case.* On October 1, 1970, 68 inmates were transferred from the House of Correction to the Penitentiary. On October 2 four more inmates were transferred from the House of Correction to the Penitentiary. The 72 inmates were transferred because their names appeared on a list compiled by authorities at the House of Correction as a result of a series of work stoppages which had occurred there on September 29 and 30 and October 1. During the late hours of September 28, many inmates of J dormitory had become concerned about another inmate of that dormitory who was ill and who they believed was not receiving proper medical attention. Their dissatisfaction resulted in an excited dialogue with Warden Williams about midnight on that date, and the taking of the ill man to a hospital where he was examined and returned to the House of Correction. Work stoppages on the three consecutive days occurred when punishment was meted out to eight inmates of J dormitory as a result of the September 28 incident. The inmates involved in the work stoppages were employed in the industrial compound, where the vocational shops are located. There was no attempt by the Warden or the Correctional Officer involved to determine specifically what conduct of the plaintiffs necessitated or justified the transfer of the individual men to the Penitentiary under the highly charged atmosphere caused by the work stoppages.

On arrival at the Penitentiary the men were stripped, searched and issued standard clothing for use in the segre-

---

8. Statutory periods of time credited to an inmate in diminution of the sentence, for satisfactory service of sentence at rates of five and ten days per month, depending on the length of the sentence. Article 27, § 700(b), (c), (d), Md.Code (1957).

gated confinement cells to which they were then taken.

Within two or three days the 68 men, as well as four other men who had been subsequently transferred to the Penitentiary, were brought before an Adjustment Committee composed of one of the correctional officers who had compiled the lists, a classification supervisor and a counselor, all of whom were employed at the House of Correction. Of the 72 inmates, 17 were accused of specific acts of misconduct. The other 55 were told by the Adjustment Committee that they were transferred because they were "not amenable to the program security level of the Maryland House of Correction". The procedures followed at the Adjustment Committee hearings were the same in all cases. The charge was read to the inmate or, where there were no charges, the reason for the transfer was read. The inmate was then allowed to respond. A decision was immediately reached. The 72 hearings took less than four hours.

The recommendation of the Adjustment Committee in the cases of the 17 inmates charged with specific acts of misconduct was to place them indefinitely in segregated confinement quarters at the Penitentiary, to forfeit five days of their "good conduct time", and to recommend that Commissioner Cannon forfeit up to 100 additional days. The recommendation in those cases was approved by Warden Fitzberger of the Penitentiary, and subsequently, with respect to the revocation and forfeiture of "good conduct time", by the Commissioner's office.

The recommendation of the Adjustment Committee in the cases of the 55 inmates transferred because they were not "amenable to the program security level of the Maryland House of Correction" was that those individuals be remitted to the jurisdiction of the Penitentiary. Warden Fitzberger decided that they too should be kept in segregated confinement for at least 30 days, in accordance with routine procedure at the Penitentiary.

In none of the cases was the inmate given written notice of any charges or allegations of misconduct, nor informed that a hearing would be held until just before the hearing. In none of the cases was an inmate given the opportunity for representation or assistance by another inmate or staff member, nor to question the witnesses against him or call witnesses on his behalf.

As a result of the hearings, some of the plaintiffs lost substantial amounts of "good conduct time" and all of them were placed in segregated confinement for an indefinite period. Some were transferred to the general population of the Penitentiary after 30 days or more; some were still in segregated confinement at the time of the hearing in this case; a few of them had refused transfer to the general population of the Penitentiary.

*Adjustment Procedures.* At the time these actions were filed there was no handbook setting out in detail the prison rules, but there had been published a list of ten general rules of conduct, the violation of which would subject an inmate to disciplinary action. Such disciplinary action might include: counselling and/or warning; reprimand; adjustment release; temporary loss of one or more privileges; loss of good behavior time; loss of grade status; confinement to maximum security quarters (segregated confinement); and in the case of serious offenses, revocation of good conduct time.

An administrative directive covering "Adjustment Procedures" had been issued by the Commissioner effective June 1970. It included provisions for (A) "The Administration of Adjustment Procedures" in cases where the inmate was charged with an infraction of the rules, and (B) "Adjustment Transfer of Inmates" because the "behavior of the inmate has indicated that he cannot adjust in a lesser security status".

*Discussion*

In McCloskey v. State, 337 F.2d 72 (4 Cir. 1964), the Court said:

"Because prison officials must be responsible for the security of the prison and the safety of its population, they must have a wide discretion in promulgating rules to govern the prison population and in imposing disciplinary sanctions for their violation. If a tractable inmate is subjected to cruel and unusual punishment or if his exercise of a constitutional right is denied without semblance of justification arising out of the necessity to preserve order and discipline within the prison, he may have a right of judicial review. In the great mass of instances, however, the necessity for effective disciplinary controls is so impelling that judicial review of them is highly impractical and wholly unwarranted. The remedy of the inmate is through administrative review, which ought to be available always." 337 F.2d at 74.

This Court notes that by the Act of 1971, ch. 210, approved April 29, 1971, effective July 1, 1971, Maryland has provided what appears to be an excellent system of administrative review of inmate grievances, through an Inmate Grievance Commission, with an ultimate right of review by the State Courts.

■ Segregated confinement does not itself violate the Constitution. Sostre v. McGinnis, 442 F.2d 178, 192 (2 Cir. 1971); Landman v. Peyton, 370 F.2d 135 (4 Cir. 1966); Courtney v. Bishop, 409 F.2d 1185 (8 Cir.), cert. denied, 396 U.S. 915, 90 S.Ct. 235, 24 L.Ed.2d 192 (1969); Graham v. Willingham, 384 F.

2d 367 (10 Cir. 1967); U. S. ex rel. Knight v. Ragen, 337 F.2d 425 (7 Cir. 1964), cert. denied, 380 U.S. 985, 85 S. Ct. 1355, 14 L.Ed.2d 277 (1965); Krist v. Smith, 309 F.Supp. 497 (S.D.Ga. 1970); Roberts v. Barbosa, 227 F.Supp. 20 (S.D.Cal.1964). As noted by the Second Circuit "a similar form of confinement is probably used in almost every jurisdiction in this country and has been described as one of 'the main traditional disciplinary tools' of our prison systems. *President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Corrections 50–51 (1967); S. Rubin, et al., The Law of Criminal Corrections 293 (1963).*" 442 F.2d at 192. Operative rules in some states have limited the duration of segregated confinement, but in others incarceration in segregated cells for an indefinite period is permitted. The federal practice appears to be that prisoners shall be retained in solitary "for as long as necessary to achieve the purposes intended", sometimes "indefinitely". Furthermore, "willful refusal to obey an order or demonstrated defiance of personnel acting in line of duty may constitute sufficient basis for placing an inmate in segregation".[9] 442 F.2d 192.

The plaintiffs in these cases do not contend that the prison officials erred in not giving them a hearing prior to their transfer from the Sykesville Laundry Camp or the House of Correction to the Penitentiary. Plaintiffs challenge the constitutional sufficiency of the hearings which were conducted after their transfer to the Penitentiary, as a result of which all of them were placed in segregated confinement for an indefinite period of time and many of them

9. Bureau of Prisons, Policy Statement: Inmate Discipline, No. 7400.5A, ¶ 3.c, App. B ¶ 1.d(d) (July 2, 1970). The Supreme Court has struck down a choice of punishments only when the penalty was authorized in almost no other civilized jurisdiction. Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958); Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910), or conflicted with moral precepts "universally held", Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). See also Jackson v. Bishop, 404 F.2d 571, 580 (8 Cir. 1968) (use of strap permitted in only two states, outlawed in several).

lost substantial amounts of good conduct time.

### (A)

It is now well established that incarceration does not mean that prisoners have no constitutional rights. Lee v. Washington, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968); Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); Sostre v. McGinnis, 442 F.2d 178 (2 Cir. Feb. 24, 1971); Edwards v. Duncan, 355 F.2d 993, 994 (4 Cir. 1966). But, as the Second Circuit noted in Sostre v. McGinnis, "[b]eyond the process of guilt determination and initial incarceration, courts have displayed greater reluctance to import all the trappings of formal due process. * * * Certainly, formal rules of evidence would be entirely inappropriate at a disciplinary proceeding. * * *." 442 F.2d at 196. The difficult question, as always, is what process was due. In Hannah v. Larche, 363 U.S. 420, 80 S. Ct. 1502, 4 L.Ed.2d 1307 (1960), the Court said:

> "[A]s a generalization, it can be said that due process embodies the differing rules of fair play, which through the years, have become associated with differing types of proceedings. Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are all considerations which must be taken into account. * * *" 363 U.S. at 442, 80 S.Ct. at 1515.

The procedures followed in the instances where the inmate was charged with an infraction of the rules did not afford him: (1) adequate notice of the alleged misconduct or of the time when the hearing would be held; nor (2) an opportunity to question the person charging him with an offense or to present witnesses on his own behalf; nor (3) an impartial "Adjustment Team", since the correctional officer pressing the charge was a member of the Adjustment Team which heard his case.

Adequate notice of charges in a substantial disciplinary proceeding is necessary to afford a prisoner the opportunity to prepare a defense. Although holding that all the elements of trial-type procedure ordered by the lower court were not necessary to the constitutionality of every disciplinary action taken against a prisoner, the principal opinion in Sostre v. McGinnis said:

> "* * * We would not lightly condone the absence of such basic safeguards against arbitrariness as adequate notice, an opportunity for the prisoner to reply to charges lodged against him, and a reasonable investigation into the relevant facts—at least in cases of substantial discipline." 442 F.2d at 203.

Other recent decisions dealing with the rights of inmates in prison disciplinary proceedings have found written notice a basic constitutional requirement in substantial cases.[10]

Another basic component of fundamental procedural fairness is a hearing before a relatively objective and impartial tribunal.[11] This principle is violated when the same prison official assumes the dual responsibility of (1) initiating and pressing charges of misconduct, and (2) subsequently determining, as a member of an administrative body,

---

10. Carothers v. Follette, 314 F.Supp. 1014 (S.D.N.Y.1970); Nolan v. Scafati, 306 F.Supp. 1, 3 (D.Mass.1969), vacated and remanded, 430 F.2d 548 (1 Cir. 1970); Kritsky v. McGinnis, 313 F.Supp. 1247 (N.D.N.Y.1970); Wright v. McMann, 321 F.Supp. 127 (July 31, 1970), on hearing after remand, 387 F.2d 519 (2 Cir. 1967).

11. Carothers v. Follette, supra, 314 F. Supp. at p. 1029, and cases cited therein.

whether misconduct has occurred and assessing appropriate punishment.

It is undisputed that plaintiffs in these cases did not receive notice of the charges until they appeared before the disciplinary board. It is also undisputed that in both cases, arising in different institutions, an official who participated as a member of the disciplinary panel had been instrumental in pressing the charges.[12]

■■ The protracted segregated confinement in maximum security quarters and/or the loss of "good time", here complained of, constitute punishment sufficiently severe to require minimum due process safeguards. Sostre v. McGinnis, supra, 442 F.2d at 195; Carothers v. Follette, 314 F.Supp. 1014 (S.D. N.Y.1970); Rodriguez v. McGinnis, 307 F.Supp. 627, 629 (N.D.N.Y.1969); Howard v. Smyth, 365 F.2d 428 (4 Cir. 1966). The question thus presented is whether the procedures utilized by the correctional officials in these cases met constitutional standards of due process required by the Fourteenth Amendment. Based on the agreed stipulation of facts submitted by the parties, supplemented by the testimony and other evidence presented in Court, it is clear that they did not.

These cases do not present isolated instances of such departures from due process. Indeed, they appear to have been generally followed in Maryland correctional institutions before the hearing in this case.

### (B)

■ *Administrative Transfers.* A prisoner has no vested right to be assigned to or to remain in a medium security or a minimum security institu-tion. The Division of Correction has the right to transfer prisoners from one institution to another, whether to a higher, equal or lower security status, for administrative, therapeutic, adjustment or other reason, without the need for a hearing under those procedures.

■ Transfers from one institution to segregated confinement in another institution should be treated, except for temporary segregation during a classification period of reasonable length, on the same basis as a change from nonsegregated to segregated status within an institution.

### Relief

After argument by counsel had been heard, the Court stated that it was prepared to enter an interim opinion and order holding that plaintiffs were entitled to relief in their individual capacities, and to a ruling with respect to the practices generally followed by the Division of Correction.

The amici curiae prepared, submitted to counsel for the respective parties and presented to the Court proposed disciplinary hearing procedures. Counsel for plaintiffs agreed that the disciplinary hearing procedures proposed by the amici curiae met minimum standards of constitutional due process. Counsel for the Division of Correction stated that the proposed procedures appeared practicable, and consented that those procedures be prescribed in an interim order. They assured the Court that the Division would take immediate steps to implement those procedures.

Pursuant to such consent on March 2, 1971, the Court entered an interim order, which: (I, II) granted individual relief to the plaintiffs in the *Bundy* case and in the *Adams* case;[13] and (III)

---

12. In *Bundy*, the inmates who were transferred from Sykesville Laundry Camp were tried by a panel including the Acting Director of the Camp, who was deeply involved in the incident. In *Adams*, a Senior Security Officer was on the disciplinary panel despite the fact that he was responsible for compiling the list of those to be transferred, and approved the transfers.

13. The Court is advised that the individual relief granted in said order has been substantially afforded, although in a few instances some question has arisen which is still unresolved.

in accordance with the agreement of counsel referred to above, ordered that the Department of Public Safety and Correctional Services of the State of Maryland and its Division of Correction should promptly establish rules and regulations for all future adjustment violations not less favorable to the inmate than the procedures specified in the interim order.

In February 1971, while this case was pending, the Division of Correction issued a new "General Information and Guidance Handbook for Inmates", which included under the heading "General Rules and Regulations", a list of so-called "Adjustment Violations", which could be the basis for disciplinary action.

On March 12, 1971, the Division of Correction adopted "Adjustment Procedures" for dealing with violations of the Rules, which are generally similar to those included in the interim order entered by consent on March 2, 1971. Those procedures, as modified on May 17, 1971, have been filed as an exhibit in this case, and are set out as an appendix to this opinion. The Court is advised that those procedures are being followed, and is assured that they will be followed in the future, with one exception. No funds have yet been provided by the State for the employment of the Hearing Officers in the office of the Commissioner of the Division of Correction, called for by the "Adjustment Procedures". This is unfortunate, because the use of such Hearing Officers from the office of the Commissioner of the Division of Correction, rather than persons employed at the institution, as presiding officers at disciplinary hearings, is a highly desirable feature of those "procedures", analogous to the use of JAG officers in court martial proceedings. The Court has been advised that since March 10, 1971, the Division has been able to provide such a Hearing Officer in some cases, and that they intend to provide such personnel as

may be necessary to provide Hearing Officers for major violations.

On March 10, 1971, the Division of Correction adopted an Administrative Directive dealing with non-punitive "Adjustment Transfers to the Maximum Security Institution", which set up reasonable guidelines not required by the interim opinion or order.

 For all of the foregoing reasons, the Court does not believe that it is necessary or appropriate to include in the decree to be entered herein any injunctive relief with respect to procedures in future cases. It is not desirable that a federal court should undertake by injunction or otherwise to supervise the continuous operation of a State correctional system, nor to prescribe rules and regulations governing such operation, see McCloskey v. State, quoted above, although a federal court must in exceptional cases under 42 U.S.C. § 1983 exercise its jurisdiction to prevent deprivation of constitutional rights.

This Court will retain jurisdiction to consider various questions which have arisen as to whether all of the plaintiffs have received the individual relief required by the interim order.

The Court expresses great appreciation for the services rendered by Mr. Belgrad and Mr. Civiletti as amici curiae. The case could not have been presented so expeditiously and fairly without their assistance to counsel in the preparation of the stipulation of facts and their many hours and days of work in preparing the proposed hearing procedures, as well as their review of the law and appearances in court.

### APPENDIX

### MARYLAND

Department of Public Safety and Correctional Services

### DIVISION OF CORRECTION

ADJUSTMENT PROCEDURES:

When a written report is submitted to the Classification Department which

states that an inmate has committed a violation of the rules, the Adjustment Team will evaluate the report and determine if the alleged violation is a minor or major violation.

MINOR VIOLATION: A minor violation is one that if the inmate is found guilty, the maximum sentence he could receive would not be over fifteen (15) days confinement or the loss of over five (5) days, or both. In minor violations the following procedures shall be followed:

1. The inmate shall be furnished a written statement of the minor violation with which he is charged. The statement should be served not later than forty-eight (48) hours after the alleged violation, and the inmate will appear before the Adjustment Team within seventy-two (72) hours of the alleged infraction, unless prevented by exceptional circumstances.

The inmate will not be given a written statement of the charge until the Adjustment Team has determined that he will have to appear before the Team for a formal hearing.

2. The Adjustment Team to hear minor violations of the rules will consist of the following members:

(a) Assistant Warden of Treatment, Chairman.

(b) A Hearing Officer from the office of the Commissioner of the Division of Correction. The Hearing Officer will also act as the Chairman of the Team whenever the Assistant Warden is not present. (A Classification Counselor will be used as a member of the Team, but never as Chairman, until the Hearing Officer is obtained).

(c) A Senior Correctional Officer.

3. The Adjustment Team's function is:

(a) To evaluate the inmate's alleged infraction and render a fair and objective verdict as to his involvement in the infraction.

(b) To determine what type of adjustment should be rendered if the inmate is found to have committed the infraction.

4. The inmate will be given a chance to discuss his case when he appears before the Adjustment Team and he may also have the following representation:

(a) Another inmate or staff member to appear before the Adjustment Team with him as his representative. The inmate or staff member must do so on a voluntary basis.

5. If it is found that an infraction has not been committed by the inmate, he is released and the Adjustment report will duly state that the inmate was not found guilty of committing the infraction.

6. If the Adjustment Team determines that the inmate has violated a rule, he may be subjected to one or more of the following actions:

(a) Counselling and/or warning.

(b) Reprimand.

(c) Adjustment release.

(d) Temporary loss of one or more privileges.

(e) Loss of good behavior time (not to exceed five (5) days).

(f) Confinement (not to exceed fifteen (15) days).

The Adjustment Team may recommend a change in housing or job assignment, but said recommendation must be approved by the Classification Team.

7. The Team will make a written summary of its proceeding, including its decision and a brief statement of the reasons for that decision. He shall have the right, at the conclusion of the hearing, to state any objections he may have to the decision of the Team.

8. If the inmate objects to the decision, the Warden or his designated representative shall, within three (3) days after the hearing, review the decision of the Adjustment Team, based upon the record of its proceedings.

9. On review, the Warden may take the following action:

(a) Agree with the decision of the Adjustment Team.

(b) Order further or new proceedings.

(c) Reduce or suspend the decision of the Team.

The Warden cannot increase the sentence handed down by the Adjustment Team, nor can he order new proceedings, charging a major violation in his review of a minor violation.

10. Even if the inmate does not object to his sentence, the Warden will review all cases involving the loss of good behavior time and/or confinement.

11. The inmate will be notified in writing of the result of the review of his case by the Warden.

MAJOR VIOLATIONS: A major violation is one in which the inmate, if found guilty of the violation, could receive a sentence of confinement for more than fifteen (15) days and/or the loss of good behavior time of more than five (5) days. In major violations the following procedures will be followed:

1. The inmate shall be furnished a written statement of the major infraction with which he is charged. The written statement shall be served to the inmate not later than forty-eight (48) hours after the alleged violation, and the inmate will appear before the Adjustment Team within seventy-two (72) hours of the alleged violation unless prevented by exceptional circumstances.

2. The inmate will not be given a written statement of the charge until the Adjustment Team has determined that he will have to appear before the Team for a formal hearing.

3. The Adjustment Team to hear *major violation* of the rules will consist of three (3) members or as many as seven (7) members.

(a) Assistant Warden of Treatment, Chairman.

(b) A Hearing Officer from the office of the Commissioner of the Division of Correction. The Hearing Officer will act as Chairman of the Team whenever the Assistant Warden is not present. (A Classification Counselor, or another professional treatment staff member, may be substituted for the Hearing Officer until he is obtained).

(c) A Classification Supervisor or a Classification Counselor.

4. The Warden or his representative may assign other members of the professional treatment staff to the Adjustment Team on major violations if he deems it necessary.

5. The inmate shall appear before the Adjustment Team to discuss his case and he shall be represented by another inmate or a staff member at the hearing, but the inmate or staff member representing the inmate must do so on a voluntary basis.

6. The Adjustment Team shall allow the inmate the opportunity to call one or more witnesses if the Team determines it is practical or relevant to the inmate's case. Such witnesses may include the accuser and the employee who presented the charges.

7. The Team shall allow the inmate to question any witnesses who testify before the hearing if they deem it relevant to his case.

8. Such rights of the inmate shall not be unreasonably withheld or restricted by the Adjustment Team.

9. The Adjustment Team shall make a written report of all its proceedings to include a summary of the evidence, the Team's evaluation and decision, and the reason for the Team's decision. The decision of the Team must be based on substantial evidence.

10. If it is found that a violation has not been committed, the inmate shall be released and the Adjustment report shall duly state that it was determined that the inmate was not guilty of the violation.

**177**

11. If the Team determines that the inmate is guilty of the violation, the inmate may receive any one or more of those penalties designated for minor infractions, or he may receive one or both of the following penalties:

(a) Loss of good behavior time to exceed more than five (5) days.

(b) Confinement to exceed more than fifteen (15) days.

The Adjustment Team may also recommend a change in housing or job assignment or a transfer to an institution of greater security, but such recommendations must be approved by the Classification Team.

All cases involving confinement for periods of over thirty (30) days must be reviewed every 30 days by the Classification Team with the idea of determining, if feasible, an alternate to confinement that will be of adjustment value to the inmate. During the period of confinement, the inmate will be seen for counselling on a frequent basis by the psychologist/psychiatrist, and his classification counsellor, and progress reports will be submitted to the Classification Department after each visit. This may include visits from the chaplain and other staff members who may have the ability to communicate with the inmate as long as it does not present a security problem. Deliberate mental or physical abuse of the inmate during his confinement will not be tolerated.

12. The inmate shall be advised of the decision of the Team and the basis for its decision. He shall have the right, at the conclusion of the hearing, to state any objections he may have to the decision of the Team.

13. The Warden will review all cases involving major violations, and upon review may decide on one of the following actions:

(a) Agree with the decision of the Team.

(b) Order further or new proceedings.

(c) Reduce or suspend the sentence.

The Warden cannot increase the sentence determined by the Adjustment Team.

14. The inmate will be notified of the result of the review process.