**James FITCHETTE**

v.

**George H. COLLINS, Warden.**

Civ. No. B–75–505.

United States District Court,
D. Maryland.

Oct. 13, 1975.

James Fitchette, pro se.

John P. Stafford, Jr., Asst. Atty. Gen., Baltimore, Md., for respondent.

## MEMORANDUM AND ORDER

BLAIR, District Judge.

Plaintiff, James Fitchette, is currently a prisoner in the Maryland Penitentiary. He brings this action against the Warden, George H. Collins, seeking $20,000 in damages for "Mental Anguish and False Imprisonment Which Petitioner was made to suffer for some seven (7) months" after being convicted by the Adjustment Team at the penitentiary of assault on an inmate by stabbing, a conviction that was subsequently "reversed" by the Maryland Inmate Grievance Commission. While the jurisdictional basis for the action is not alleged, the court construes the complaint as asserting a claim for relief under 42 U.S.C. § 1983 for deprivations of constitutional rights under color of state law. This court therefore has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1343(3).

On May 7, 1975, the defendant filed a motion to dismiss, attaching thereto the opinion and Order of the Inmate Grievance Commission (IGC) on plaintiff's case, as well as the subsequent Order of the Secretary of the Maryland Department of Public Safety and Correctional Services (Secretary) modifying the IGC's order. Also attached is a letter from James Jordan, Commissioner of Corrections, to the Secretary informing the latter of compliance with the Order. Treating these papers as a motion for summary judgment, see Fed.R.Civ.P. 12(b), the court by letter of July 14, 1975 informed plaintiff of his right to file in opposition "any relevant materials, including affidavits or statements under penalties of perjury, contradicting, explaining, or avoiding the defendant's materials." On July 25, 1975, plaintiff filed a paper entitled "Plaintiff's Rebuttal to Defendant's Motion to Dismiss for Summary Judgment," which this court will treat as an affidavit in response to the motion to dismiss.

In the complaint, plaintiff generally contends that he

was denied his constitutional Rights to a Fair and impartial hearing when the adjustment team hearing officers demonstrated prejudicial bias against your (Plaintiff) as shown by the following facts:

a) That the hearing officers errored (sic) in denying (Plaintiff) his right to call witness for his defense, to wit the alleged accuser.

b) That upon sanctioning accused testimony that (Plaintiff) was not a party of the assault, the team refused to release (Plaintiff).

c) That the result of (Plaintiff's) False imprisonment he was the victim of a stabbing. (Plaintiff) was stabbed in his back by another inmate on segregation.

Plaintiff's Complaint, at 2. Plaintiff seeks only damages for the alleged wrongful conduct of defendant. The undisputed facts as disclosed by the materials submitted to this court and as construed most favorably to the plaintiff are as follows:

On January 8, 1973, Leslie Joyner, an inmate in the Maryland Penitentiary, was stabbed during an altercation with several other inmates. Plaintiff was accused of holding the victim while another inmate did the stabbing. Plaintiff was immediately placed in segregation pending a formal hearing before the Adjustment Team on a charge of being an accomplice to an assault on an inmate. Plaintiff alleges that he was not notified of the charges within 48 hours of the alleged infraction, which he contends to be violative of the adjustment procedures for the Maryland Division of Correction.

A hearing was held before the Adjustment Team on January 11, 1973. Two

witnesses testified against the plaintiff: Sgt. Jednoiski, a correctional officer, and William Jennings, an inmate. Jennings testified that he was in his cell and saw plaintiff struggling with Joyner at the place of the incident, the fifth tier, apparently at or near the time of the stabbing. Sgt. Jednoiski testified that plaintiff was on the fifth tier when he and another officer arrived on the scene.

Plaintiff apparently contended, and contends here, that, though he was present at the scene of the stabbing, he interceded on behalf of Joyner in an attempt to stop the fight and prevent further harm. At the adjustment hearing, plaintiff therefore asked that Joyner be called as a witness. Joyner was present at the hearing but refused to testify, and the Adjustment Team did not compel him to do so. On the basis of the evidence presented, the Adjustment Team found plaintiff guilty and sentenced him to one year in segregation and the loss of 100 days' good conduct time.

Plaintiff thereafter appealed his conviction to the Inmate Grievance Commission. The Commission held hearings on April 18 and 30, 1973, at which time plaintiff was present and represented by another inmate. Joyner was also present at this hearing and decided to give testimony on plaintiff's behalf. Joyner affirmatively stated that though plaintiff was present at the stabbing, he had actually assisted Joyner and was not involved in the assault. The Commission specifically found that the Adjustment Team had not acted improperly, but based on all the evidence then available to the Commission, there was not sufficient evidence to find plaintiff guilty of the particular charge. Accordingly, the Commission recommended "that the record of Mr. Fitchette be ex-

punged as to the finding of guilt as to the assault or accomplice to assault on January 3, 1973." Order of Maryland Inmate Grievance Commission, June 26, 1973, at 3. This order was subsequently modified by the Secretary of the Maryland Department of Public Safety and Correctional Services to give the Division of Correction the option of a new adjustment hearing if it so desired. The Division of Correction chose to drop the charges and plaintiff's record with respect to the assault offense was expunged. Letter of July 17, 1973, from James Jordan, Commissioner of Corrections, to Robert J. Lally, Secretary, Maryland Department of Public Safety and Correctional Services.

On June 8, 1973, while plaintiff was still on segregation, the segregation tier, as well as all inmates on segregation, were searched for weapons in preparation for allowing such inmates to take a shower. Plaintiff was nevertheless stabbed in the back by another inmate during the shower. Plaintiff contends that the stabbing was the result of the negligence of one of the officers in permitting an inmate to conceal an eight-inch knife during the customary pre-shower search.[1] Plaintiff also alleges that while he was on segregation, the prison officers, in using tear gas to subdue another disorderly inmate, sprayed plaintiff in the face, causing plaintiff and other innocent parties to suffer indiscriminately.

Liberally construed, plaintiff's allegations and contentions raise five possible constitutional claims:

1. Plaintiff was denied the right to call witnesses on his behalf at the disciplinary hearing.

2. Plaintiff was not notified of the charges within 48 hours of the occurrence of the alleged infraction, contrary

---

1. The defendant's version of this incident, as stated in his motion to dismiss, is somewhat different, but since it is not supported by affidavit or other relevant materials, it cannot be considered by this court, in accordance with the proper standard procedures under Rules 12(b) and 56 of the Federal Rules of Civil Procedure.

to the requirements of the adjustment procedures.[2]

3. The evidence at the hearing was insufficient to support his administrative conviction.[3]

4. The defendant failed to protect the plaintiff against assaults by other inmates while on segregation.

5. Plaintiff was subjected to cruel and unusual punishment in being sprayed by tear gas.[4]

I. *Claims Concerning the Disciplinary Proceedings*

 The first three claims involve the broad question of whether plaintiff was denied due process in connection with his hearing and conviction by the Adjustment Team. It is settled that a prisoner cannot be disciplined for violation of prison rules without being afforded a modicum of due process; and a prisoner may challenge a denial of due process by means of a suit under 42 U.S.C. § 1983 for damages and declaratory and injunctive relief other than the restoration of good conduct time. *Wolff v. McDonnell,* 418 U.S. 539, 555–58, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Bundy v. Cannon,* 328 F.Supp. 165, 172–73 (D.Md.1971). Before reaching the merits of plaintiff's due process claims, however, it must be first ascertained whether or not the prison warden can be held liable in damages under 42 U.S.C. § 1983 for his involvement in the adjustment process as established by the Maryland Division of Correction.

A. *Immunity under 42 U.S.C. § 1983.*

 The Warden of the Maryland Penitentiary is, to some extent, involved in the adjudicatory process of the prison disciplinary procedure in every case in which a prisoner is convicted of a "major" violation of the prison rules and regulations. The warden is required to review all such cases, and may thereupon do one of the following:

1. Agree with the decision of the Adjustment Team.

2. Order further or new proceedings.

3. Reduce or suspend the sentence.

The warden cannot increase the sentence imposed by the Adjustment Team. *See generally Bundy v. Cannon,* 328 F.Supp. 165, 177 (D.Md.1971). Assault on an inmate is considered a "major" violation, and, hence, while it is not specifically pleaded, the court will assume that the defendant in this case was personally involved in plaintiff's case and that the defendant affirmed the decision of the Adjustment Team pursuant to the first option mentioned above. The question thus presented is whether the warden can obtain the benefit of an absolute immunity from liability for damages, similar to that afforded other judicial and quasi-judicial state officers under section 1983, for acts committed in the performance of this adjudicatory function—acts that allegedly have deprived a prisoner of his due process rights.

 In *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), the Supreme Court held that state judges enjoy an absolute immunity from suit for damages under 42 U.S.C. § 1983 for acts committed within their judicial jurisdiction. *Id.* at 553–54, 87 S.Ct. 1213. In adopting the common law judicial immunity for purposes of section 1983, the Court stated its rationale as follows:

It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants. His

---

2. This claim was raised for the first time in plaintiff's "rebuttal" to defendant's motion to dismiss.

3. This claim, literally transcribed, reads as follows: "That upon sanctioning accused testimony that Petitioner was not a party of

the assault, the team refused to release Petitioner." The court construes this claim as an attack on the sufficiency of the evidence.

4. This claim was also raised for the first time in plaintiff's "rebuttal" to defendant's motion to dismiss.

errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision-making but to intimidation.

*Id.* at 554, 87 S.Ct. at 1218. Hence, a state judge is immune from liability for damages under section 1983 for his role in adjudicating a defendant guilty in a proceeding that is alleged to be infected with constitutional error.[5] *Id.* at 553, 87 S.Ct. 1213.

In the Fourth Circuit, this privilege of absolute immunity for liability in damages under section 1983 has been extended to prosecuting attorneys, *Weathers v. Ebert,* 505 F.2d 514 (4th Cir. 1974); *McCray v. Maryland,* 456 F.2d 1, 3 (4th Cir. 1972) (dictum), parole board members, *Brown v. Boxley,* No. 75–1186, at 2–3 (4th Cir., Apr. 2, 1975) (per curiam), and state officers acting under direction of a court order, *McCray v. Maryland, supra* at 5; *Steinpreis v. Shook,* 377 F.2d 282 (4th Cir. 1967). This immunity derives not from their formal association with the judicial process,

> but from the fact that they exercise a discretion similar to that exercised by judges. Like judges, they require the insulation of absolute immunity to assure the courageous exercise of their discretionary duties. Where an official is not called upon to exercise judicial or quasi-judicial discretion, courts have properly refused to extend to him the protection of absolute judicial immunity, regardless of any apparent relationship of his role to the judicial system.

*McCray v. Maryland, supra* at 3–4. Thus, a state court clerk who acts in violation of his mandatory duties or in excess of his authority under a statute or court order is not entitled to absolute immunity, because he would not then be exercising the judicial or quasi-judicial discretion that requires such protection. *Id.* at 4–5.

■ It is therefore apparent that the question of a state officer's judicial immunity depends not upon his association or lack thereof with the state court judicial process, but rather on the presence or not of the reasons underlying the creation of the immunity shield. *See id.* at 3.

> "The proper approach is to consider the precise function at issue, and to determine whether the officer is likely to be unduly inhibited in the performance of that function by the threat of liability for tortious conduct." *Carter v. Carlson,* (144 U.S.App.D.C. 388, 447 F.2d 358, 362 (1971), *rev'd on other grounds,* 409 U.S. 418, 93 S. Ct. 602, 34 L.Ed.2d 613 (1972)). . . . The privilege of absolute judicial immunity should be "applied sparingly" in suits brought under section 1983 since to give too wide a scope of protection to state officials would effect a "judicial repeal" of the congressional purpose to make liable "every person" who under color of state law abridges a citizen's rights.
> . . .

*Id.*

■ There can be no doubt that the precise function of the Adjustment Team members and of the warden in reviewing their decision under the Maryland adjustment procedures is at least quasi-judicial in character. Each is intimately involved in weighing evidence and adjudicating facts to determine whether a particular prisoner has violated prison rules and regulations and whether to subject the prisoner to additional punishment. This punishment

---

5. The concept of general absolute immunity for judicial or quasi-judicial officials does not extend to actions for injunctive or declaratory relief under 42 U.S.C. § 1983.

*Fowler v. Alexander,* 478 F.2d 694, 696 (4th Cir. 1973). *See also Mitchum v. Foster,* 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972).

can amount to loss of privileges, imposition of more severe conditions of confinement, and the loss of "good conduct" time. The last is a punishment that is especially judicial in nature since its imposition requires a particular prisoner to serve a longer term in confinement. These factors show beyond doubt that the adjustment team members and the warden exercise a quasi-judicial function in the prison adjustment process under the Maryland regulations.

The quasi-judicial nature of the function is not determinative of the immunity question, however, because the court must further determine whether the adjustment team and the warden are "likely to be unduly inhibited in the performance of that function by the threat of liability for tortious conduct." For example, in *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), the Supreme Court rejected an absolute immunity from damages for the acts of school board members who were alleged to have violated a student's due process rights during a disciplinary hearing in which it was determined that a student had violated the school regulations. The Court recognized that the school board members function as adjudicators in these proceedings, involving the exercise of discretion and the weighing of many factors in reaching a decision. *Id.* at 308, 95 S.Ct. 992. The Court also noted that the state courts had developed a common law qualified immunity to protect them from damage suits for acts committed during the exercise of these functions. *Id.* Nevertheless, the Court emphasized that

> the judgment implicit in this common-law development is that absolute immunity would not be justified since it would not sufficiently increase the ability of school officials to exercise their discretion in a forthright manner to warrant the absence of a remedy for students subjected to intentional or otherwise inexcusable deprivations.

*Id.* Hence, the Court adopted a qualified immunity for school board officials:

> (I)n the specific context of school discipline, we hold that a school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student.

*Id.* at 322, 95 S.Ct. at 1001. The Court emphasized, however, that school board members are not charged with predicting the future course of constitutional law. Rather, damages will be appropriate only if the school board member

> has acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith.

*Id.*

While the theoretical adjudicatory function of school board members and adjustment team members are similar in nature, the practical effects of these functions are drastically different. The warden and adjustment team are burdened with the greater and more difficult responsibility of enforcing rules in an atmosphere that is charged with animosity among the officials and inmates of the prison. Violations of prison rules are much more frequent, and the adjustment team and warden must adjudicate these violations on almost a day-to-day basis. (Indeed, it is virtually the team's sole function.) Moreover, the punishment meted out is much more of a "grievous loss" than that generally imposed by school officials. In sum, the prison officials shoulder a much greater burden of responsibility much more frequently than do school officials with respect to disciplinary action taken against their respective charges. The

court notes as well the larger threat of vexatious and frivolous suits for damages that are likely to be brought against prison officials. Under such circumstances, while the nature of the loss suffered by prisoners requires a larger panoply of due process protection, the nature of the prison officials' adjudicatory discretion also requires a greater protection. The court recognizes that the privilege of absolute judicial immunity should be applied sparingly in suits brought under section 1983, but is compelled to conclude that the absence of such immunity is likely to unduly inhibit the adjustment team member and the warden in the performance of their quasi-judicial functions by the threat of liability for tortious conduct.

■■■■ Hence, the warden is immune from liability for damages under section 1983 for his actions pursuant to his quasi-judicial function in the Maryland adjustment process reviewing the decisions of the adjustment team at the penitentiary.[6] The court wishes to emphasize, however, that such immunity does not give the warden unbridled authority to violate the constitutional rights of the prisoners under his control. In order to enjoy this immunity, the warden must be exercising his adjudicatory discretion pursuant to and in accordance with expressly established and specific prisoner adjustment procedures. Thus, the immunity will not apply if the warden performs an act that is not within the scope of his authority under those procedures, such as summarily punishing a prisoner outside the established procedures without notice and an opportunity for the prisoner to be heard. Further, the warden will not enjoy absolute immunity for acts in his non-adjudicatory capacity and will be subject to liability for such acts as any other state official. Cf. McCray v. Maryland, supra at 4 n. 7. Finally, this immunity is limited only to suits for damages; the pris-

oner is not left without other remedies. He may pursue his action under section 1983 for a judgment declaring the warden's acts violative of the prisoner's rights and for an injunction ordering expungement of an unconstitutional conviction from the prisoner's file and prohibiting further punishment in terms of more severe conditions of confinement. Finally, the prisoner may seek restoration of lost good-time credits by means of federal habeas corpus after exhausting his state remedies. In Maryland, the warden's errors may be corrected on appeal to the Inmate Grievance Commission, a course pursued successfully by the plaintiff in this case, with subsequent appeals to the Maryland state courts. In balancing the purposes of section 1983 against the need of the warden to be free from the threat of liability for tortious conduct, a threat that the court finds likely to be unduly inhibiting, in the performance of the warden's quasi-judicial duties, the latter weighs most heavily in the court's consideration, given the narrow scope of the immunity and the other remedies available to an aggrieved prisoner as set forth above.

### B. Alleged Due Process Violations

Even assuming that the warden is not immune from damages under the circumstances of this case, there was no due process violation by the Adjustment Team in convicting plaintiff of the assault charge. In Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court for the first time explicated the specific elements of procedural due process that must be afforded inmates at prison disciplinary hearings. These minimum requirements are (1) advanced written notice of the claimed violation of prison rules; (2) a written statement of the evidence relied upon and the reasons for the disciplinary action taken; and (3)

---

6. It should be noted that, under the common law of Maryland, prison wardens are immune from liability even for acts outside the adjustment process absent a showing of evil purpose or actual malice. See Carder v. Steiner, 225 Md. 271, 170 A.2d 220 (1961).

the right of the inmate to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals. The Court also held that, in the context of prison disciplinary hearings, due process does not require a right of an inmate to confrontation and cross-examination of adverse witness or a right to counsel. *Id.* at 563–70, 94 S.Ct. 2963. As a general due process matter, of course, the inmate would be entitled to a fair hearing by an impartial tribunal. *See id.* at 570–71, 94 S.Ct. 2963. The Court also made clear, however, that its ruling in *Wolff* would not be given retroactive effect. *Id.* at 573–74, 94 S.Ct. 2963; *Morris v. Sheffer*, No. 74–2086, at 5 (4th Cir., Apr. 23, 1975).

■ In this case, plaintiff's adjustment hearing was held on January 11, 1973, well before the Supreme Court's ruling in *Wolff*. Hence, the procedural due process requirements of *Wolff* are not strictly applicable to plaintiff's adjustment hearing. Well before the date of the plaintiff's hearing, however, some minimal requisites of due process to be afforded in state prison disciplinary proceedings in the District of Maryland had been set forth in an opinion by Judge Thomsen of this court. *Bundy v. Cannon*, 328 F.Supp. 165 (D. Md.1971). In *Bundy*, Judge Thomsen held that procedural due process requires, at a minimum, (1) adequate notice of the charges in order to afford a prisoner the opportunity to prepare a defense, and (2) a hearing before a relatively objective and impartial tribunal. *Id.* at 172. The court held that the latter principle is violated when the same prison official assumes the dual responsibility of initiating and pressing the charge and subsequently determining, as a member of an administrative body, whether misconduct has occurred and assessing appropriate punishment. *Id.* at 172–73. Since *Bundy* pre-dated plain-

tiff's hearing, the due process requirements set forth in *Bundy* are applicable. *See Morris v. Sheffer, supra* at 5.

As a result of *Bundy*, the Maryland Division of Correction adopted specific adjustment procedures that were in effect at the time of plaintiff's hearing. The specific procedures, however, were not ordered by Judge Thomsen in *Bundy* by consent decree or otherwise, and they provide procedural process far beyond that which Judge Thomsen ruled as a minimum in *Bundy*. In determining whether plaintiff was afforded due process, however, the court need determine in this case only if the minimum requirements as set forth in *Bundy* have been satisfied.

### 1. *Denial of the Right to Call Witnesses.*

■ The adjustment procedures allow the accused inmate to call witnesses on his behalf if the Adjustment Team determines it practical or relevant to the inmate's case. Plaintiff wished to call Leslie Joyner, the victim of the assault, but Joyner refused to testify. The Adjustment Team did not compel him to do so. The *Bundy* case did not require that the inmate be allowed to call witnesses, much less require a right of compulsory process. Accordingly, this court finds that the failure of the Adjustment Team to compel Joyner to testify did not violate the minimum requirements of due process as set forth in *Bundy*.

### 2. *Notice.*

■ Plaintiff complains that he did not receive notice of the charges within 48 hours after the occurrence of the alleged infraction. The adjustment procedures require notice to be given within that period of time. *Bundy* required that the inmate be given adequate notice of charges to afford a prisoner the opportunity to prepare a defense; it set forth no specific time requirements.

In this case, plaintiff does not allege that he received no notice or that the notice received was inadequate to give him sufficient opportunity to prepare a defense. Further, he alleges no actual prejudice resulting from the failure to receive more prompt notice. And while the failure of the prison officials to follow their own rules and regulations may, under some circumstances, constitute a violation of due process, *see Jones v. Gathright*, No. 74–1906 (4th Cir., May 12, 1975), nevertheless, under the circumstances of this case, where there is no actual prejudice claimed, the court cannot find that plaintiff's due process rights with respect to adequate notice were violated within the meaning of *Bundy*.

### 3. *Sufficiency of the Evidence.*

▉ The *Bundy* case did not deal with the issue of due process standards governing the sufficiency of the evidence to support a conviction by the Adjustment Team of a violation of prison rules. It has long been recognizable, however, that the concept of due process does not permit a state *court* conviction based on no evidence at all. *See Thompson v. City of Louisville*, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960); *Holloway v. Cox*, 437 F.2d 412, 413 (4th Cir. 1971). It is not clear whether this due process concept applies as well to a review of the merits of the decision by the prison adjustment team. *Cf. Walker v. Hughes*, 386 F.Supp. 32, 43 (E.D.Mich. 1974). Certainly a conviction by an adjustment team without any evidence at all would be an arbitrary one and hence violate fundamental principles of due process. *See Murphy v. Wheaton*, 381 F.Supp. 1252, 1259–60 (N.D.Ill.1974). However, the authority of a federal court to review the merits of a decision by the adjustment team cannot be great-

er than its authority to review the sufficiency of the evidence in a state court criminal proceeding. Thus, the issue is whether the conviction rested upon "any evidence at all." *Thompson v. City of Louisville, supra.*

▉ In this case, there was testimony that Fitchette was seen struggling with Joyner at the time of the alleged assault, as well as other testimony that placed Fitchette at the scene of the assault. This constitutes at least "some" evidence that plaintiff assisted in the assault on Joyner. The conviction was therefore not so totally devoid of evidentiary support as to raise a due process issue.

In any event, the Inmate Grievance Commission, after hearing the testimony of Joyner that exonerated plaintiff, "reversed" the conviction and recommended that the record of conviction be expunged. This was done by Division of Correction officials. Under these circumstances, and given the initial method of redress chosen by the plaintiff, the actions of the prison officials, including the warden, more than satisfied the requirements of due process as they were judicially construed at the time of the conviction and the subsequent proceedings leading to its reversal.

### II. *Claims Concerning the Conditions of Segregation*

▉ Plaintiff complains that, while on segregation, he was stabbed by another inmate due to the negligence of a prison officer in searching the segregated inmates before they took their showers.[7] Plaintiff also claims that he was sprayed with tear gas when prison officers were attempting to subdue another disorderly inmate.

---

7. The complaint further alleges that plaintiff had to be restrained from attacking his assailant, which resulted in plaintiff being charged with assault on an officer, appar-

ently receiving "time served" upon his conviction. Petitioner does not challenge this conviction in the current action.

Each of these claims suffer from the same common defect. Both claims fail to mention any personal involvement by the prison warden, the complaint's only defendant. In damage suits under section 1983, "some personal involvement by the defendant is required." *Barrow v. Bounds,* No. 74–1731 at 2–3 (4th Cir. July 1, 1974) (per curiam). The complaint does not allege that defendant was a participant in the negligent search or in the tear gas incident. Nor does the complaint allege that defendant was even aware of the occurrences. A single act by a subordinate without the warden's prior knowledge or approval is not sufficient to hold the warden liable under section 1983. Accordingly, defendant's motion to dismiss these claims for relief will be granted.

As to the tear gas incident, the alleged facts fall far short of demonstrating a violation of a constitutional right. Nowhere is it alleged that the spraying was intentionally or maliciously directed at petitioner, and a single tear gas incident is not likely to amount to the gross negligence that is minimally required to state a good cause of action for inflicting cruel and unusual conditions of confinement.

For the reasons stated above, it is this 13th day of October, 1975, by the United States District Court for the District of Maryland, Ordered:

1. That the motion of defendant to dismiss the plaintiff's due process claims relating to the prison disciplinary hearing, treated herein as a motion for summary judgment, be, and the same hereby is, Granted.

2. That the motion of defendant to dismiss the plaintiff's claims concerning his treatment while on segregation be, and the same hereby is, Granted.

Summary judgment on the due process claims will be entered separately.