**Vernon COLLINS et al., Plaintiffs,**

v.

**Hiram L. SCHOONFIELD et al., Defendants.**

**Civ. No. 71–500–H.**

United States District Court, D. Maryland.

Sept. 18, 1973.

Lawrence B. Coshnear, Michael S. Elder, and Charles F. Morgan, Legal Aid Bureau, Inc., Baltimore, Md., for plaintiffs.

Patrick A. O'Doherty, Baltimore, Md., for defendant Schoonfield.

Hilary D. Caplan, Baltimore, Md., for defendant Parks.

Charles E. Chlan, Baltimore, Md., for defendant Harper.

HARVEY, District Judge:

Presently before the Court is the second phase of this action brought under the Civil Rights Act by certain individuals who were confined in the Baltimore City Jail as pre-trial detainees at the time suit was instituted. The original complaint named as defendants the Warden of the Jail, two Deputy Wardens and various members of the Baltimore City Jail Board. Equitable and declaratory relief and monetary damages were sought by the plaintiffs pursuant to 42 U.S.C. § 1983.

In Collins v. Schoonfield, 344 F.Supp. 257 (D.Md.1972), Judge Kaufman of this Court decided the equitable issues raised by this action and ordered the elimination of various unconstitutional practices.[1] As indicated by Judge Kaufman in his Opinion, the parties had agreed that the issues as to damages would be tried separately from and at a different time from the trial of the equitable issues. The following was said in this regard (344 F.Supp. at 262–263):

"The parties agreed that the equitable issues should be tried separately from the damage claims and that the former should be tried first. The plaintiffs have not asked for a jury trial of the damage or any other claims. However, the Warden and the two Deputy Wardens, from whom monetary damages are sought, have reserved their respective individual rights to a jury trial of the damage claims. In advance of trial of the equitable issues counsel for both sides agreed that the first equitable issue, i. e., the constitutionality of solitary confinement in the Jail, and the damage claims growing out of specific alleged instances of such confinement, might pose for determination common questions of disputed fact and that under the principles set forth in Dairy Queen, Inc. v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), and its progeny, the Warden and the two Deputy Wardens have the right not to have any disputed fact found in a non-jury trial of the first equitable issue which would be relevant and material in the later trial of the damage claims. Additionally, during trial, it became apparent to Court and counsel that the non-jury trial of equitable issues 2–10, inclusive, might also require the finding of facts which might not be entirely unconnected with disputed factual areas presented by the solitary confinement issue and/or the monetary damage claims. For that reason, counsel and each of the parties have agreed that no facts found by this Court in this opinion will be used as evidence in the trial still to be held, nor will the transcript of the trial, which has been held, 'be used, in any manner, by *any* party to

---

1. Interim Decrees were entered on July 27 and December 13, 1972 and a Supplementary Decree on January 31, 1973.

this litigation' during the trial still to be held though none of the parties are prohibited from seeking to introduce in that future trial 'any evidence' used in the trial which has been held." (Footnotes omitted.)

By Order dated January 31, 1973, Judge Kaufman directed that the damage issues be tried by another judge, and that aspect of the case was thereupon transferred to the undersigned. With the consent of the Court, an amended complaint was subsequently filed, containing only allegations pertinent to the recovery of money damages.[2] Five plaintiffs[3] are now seeking compensatory and punitive damages from Hiram L. Schoonfield, formerly Warden of the Baltimore City Jail, from Howard B. Parks, formerly Deputy Warden and Acting Warden at the time of the hearing, and from Harry E. Harper, Deputy Warden. New counsel have now entered their appearance and are representing the defendants in the damages aspect of this litigation. This part of the case has therefore been tried on a record different from that before Judge Kaufman and with different counsel participating.

At the final pre-trial conference, defendants waived their right to a jury trial. The case was accordingly tried by the undersigned judge without a jury, and the trial lasted some five days.

At the outset, some comment is necessary with respect to the different posture of the damage claims from that of the equitable claims. Judge Kaufman was concerned with the constitutionality of long-term practices and procedures at the Baltimore City Jail and, in particular, with their effect on a class of pretrial detainees. In this phase of the litigation, the undersigned judge is called upon to rule upon specific acts of alleged unconstitutional conduct committed by the individual defendants and is asked to award damages to the individual plaintiffs because of those acts for which the defendants may be held liable under § 1983. In the trial before Judge Kaufman, substantial parts of the plaintiffs' proof were not in dispute.[4] Numerous non-party witnesses testified for both sides. Following lengthy hearings and the testimony of the many witnesses[5] and following numerous conferences with the Court, the parties during the first stage of this litigation entered into stipulations concerning many of the facts necessary for an adjudication of the equitable issues.

Here, there are sharp conflicts as to almost every fact essential to plaintiffs' right to recover damages under 42 U.S. C. § 1983. Most of these conflicts can be resolved only by resort to the credibility of the witnesses. All five remaining plaintiffs testified at the trial, as did all three defendants. Unlike the earlier hearings, defendants did respond at this trial to specific allegations as to statements and attitudes attributed to them. See Collins v. Schoonfield, *supra* at 267.

Not only is the record now before the Court markedly different from the one before Judge Kaufman, but the legal principles to be applied are also different. Federal courts have been taking an increasingly enlightened and progressive approach in considering constitutional attacks on the conditions of confinement in state and local penal institutions. Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971), cert. den. sub nom., Sostre v.

---

2. The amended complaint seeks damages under §§ 1985, 1986 and 1988, as well as under § 1983 of Title 42. However, the plaintiffs, in their briefs and arguments, have not pressed their claims under any of these other provisions of the Civil Rights Act, nor did the evidence support their right to any recoveries thereunder. This Opinion is therefore concerned only with plaintiffs' § 1983 claims.

3. There were originally six plaintiffs named in the amended complaint. However, the whereabouts of plaintiff Costes is unknown. When he did not appear at trial to testify, his claim was dismissed at the close of plaintiffs' case.

4. During the defendants' side of the case, no named defendant took the witness stand. 344 F.Supp. at 267.

5. Over sixty witnesses testified, and the trial consumed more than twenty days.

Oswald, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972); Bundy v. Cannon, 328 F.Supp. 165 (D.Md.1971); Landman v. Royster, 354 F.Supp. 1302 (E.D. Va.1973). Standards formerly accepted as modern and desirable penological goals are today recognized, under what has been called the "maturing sensitivity" of this age (442 F.2d at 190), as basic constitutional minima. This and other Courts have not hesitated to enter broad decrees requiring state and local prison officials to conform to the constitutional requirements of today. Collins v. Schoonfield, *supra;* Bundy v. Cannon, *supra;* Landman v. Royster, 333 F. Supp. 621 (E.D.Va.1971); Sostre v. McGinnis, *supra.*

■■ The thrust of a damage action under § 1983 is somewhat different. This statute authorizes the recovery of compensatory and punitive damages against an individual defendant for the unjustifiable violation of the constitutional rights of an individual plaintiff "under color" of state law. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L. Ed.2d 492 (1961); Basista v. Weir, 340 F.2d 74 (3d Cir. 1965). Thus, the liability is entirely personal in nature, intended to be satisfied out of the individual defendant's pocket. *Sostre, supra,* 442 F.2d at 205. Individual actions rather than general prison practices must therefore be critically examined to determine if constitutional violations have occurred.

■ Moreover, whereas injunctive relief, such as that previously ordered by the Court in this case, operates prospectively in most instances, the responsibility of individual prison officials to answer in damages requires the imposition of monetary penalties for their past actions. It has therefore been recognized that it would contravene basic notions of fundamental fairness if prison officials were held to be liable monetarily for acts which they could not reasonably have known were unlawful. Landman v. Royster, 354 F.Supp. at 1317. While state officials may be expected to be reasonable men, they neither can nor should be expected to be "seers in the crystal ball of constitutional doctrine" nor "charged with predicting the future course of constitutional law." Westberry v. Fisher, 309 F.Supp. 12, 17 (D.Me. 1970); Pierson v. Ray, 386 U.S. 547, 557, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); Eslinger v. Thomas, 476 F.2d 225 (4th Cir. 1973). If a prison official acts in a reasonable good faith reliance on what was standard operating procedure in his prison, he is not required to respond personally in damages. Skinner v. Spellman, 480 F.2d 539 (4th Cir. 1973).

I

*The Issues*

Plaintiffs' claims arise as a result of three different occasions when plaintiffs, or one or more of them, were placed in isolated or segregated confinement, as follows:

1. The segregated confinement of plaintiffs Collins, Whitfield and Dutton from February 24 to March 9, 1971;

2. The confinement in isolation of plaintiffs Dailey, Whitfield, Collins and Dutton from November 18 or November 19, 1971 to November 23, 1971;

3. The confinement in isolation of plaintiff Morris in December 1970 for a period of three days and the segregated confinement of plaintiff Morris in Sections K and A in January, February and March, 1971.

On February 24, 1971, Sgt. Joseph Green, a guard, was assaulted and beaten in L Section, which is the maximum security Section of the Baltimore City Jail. Plaintiffs Collins, Whitfield and Dutton and three other inmates were charged with the assault and placed in segregated confinement. They remained in such confinement for some thirteen days, from February 24, 1971 to March 9, 1971.

On November 18, 1971, plaintiffs Dailey and Whitfield were charged with infractions of Jail rules and were placed in separate isolation cells. The next day, plaintiffs Collins and Dutton were

similarly charged and placed in other isolation cells. All four plaintiffs were released from such confinement some five days later.

In December 1970, plaintiff Morris, a juvenile, was charged with a violation of Jail rules and was placed in an isolation cell for a period of three days. Thereafter, he was released from isolation and placed on Section K of the Jail for a period of seventy-one days. In February 1971, he was transferred to Section A, where he remained for some period of time.

Plaintiffs, each of whom is black, claim (1) that they were subjected to physical abuse and cruel and unusual punishment immediately before and during such confinements, in violation of their Eighth Amendment rights; (2) that punishment was summarily inflicted upon them, in violation of the due process clause of the Fourteenth Amendment; and (3) that the punishment inflicted was vindictive retribution for alleged misconduct, was not in furtherance of any legitimate institutional interest and was inconsistent with their status as pretrial detainees, all in violation of the Fourteenth Amendment. In support of these contentions, they claim, *inter alia,* that three of them were physically abused when they were removed to segregated confinement in February 1971, that while in segregated or isolated confinement they were stripped and placed in filthy cells without adequate toilet facilities or water, that they were not provided with bedding or items of personal hygiene, that they were given inadequate food and medical attention, that they were given no hearing or opportunity to respond to the charges against them, and that they were not permitted visits from their families or their attorneys. Each plaintiff seeks compensatory and punitive damages for these alleged deprivations.

The defendants do not deny that the plaintiffs were placed in isolated or segregated confinement for the periods in question. Defendants do deny that plaintiffs were confined under the conditions which they claim existed, and defendants further contend that plaintiffs have not met their burden of showing such deprivations as would entitle them to recover compensatory and punitive damages under § 1983. In addition, defendants contend that what they did was constitutionally permissible because they acted under the good faith belief that their actions were reasonable in the discharge of their discretionary duties at the Baltimore City Jail, that any physical force employed by defendants or others under their direction was reasonably necessary for maintaining order in the Jail and for removing plaintiffs to the confinement areas where they were sent as punishment for their misconduct, that any substandard conditions existing in the segregated or isolated confinement areas in February and November, 1971 were the result of plaintiffs' own defiant and hostile acts, and that plaintiff Morris, who was a juvenile, was segregated from other inmates in the Jail for his own protection.

## II

### Credibility of the Witnesses

All five plaintiffs testified in this case, as did all three defendants, and the testimony was sharply conflicting. Were this Court to give full credit to the testimony of the plaintiffs, each of them would undoubtedly be entitled to recover damages under § 1983. The lurid and sensational account of inhumane treatment which each of them presented on the witness stand in this case would, if true, constitute more than sufficient evidence to support their claims that their Eighth Amendment rights were violated by the defendants.

However, this Court cannot accept plaintiffs' versions of the facts for several reasons. First, there is no credible support in the record for the extreme claims they have made. No other inmates of the Baltimore City Jail testified in corroboration of their versions of the events. Indeed, the only other wit-

ness who testified for plaintiffs concerning details of their confinements was Father Tobey, the Catholic Chaplain of the Jail.[6] The latter was not present when plaintiffs were initially placed in segregated confinement in February 1971, nor did he know any of the circumstances of the assault of the Jail guard which led to the punishments in question. Father Tobey visited the isolation section on but two occasions in February and March, 1971, and it is clear that he accepted plaintiffs' version of what had occurred, not knowing, as this Court finds from the evidence, that the sub-standard conditions that he observed were caused by the plaintiffs themselves.[7] Nor do the exhibits admitted in evidence in this case support plaintiffs' descriptions of the conditions of their confinement. Plaintiffs' claims, then, rest almost entirely on the unsupported testimony of individuals who displayed throughout the trial extreme hostility and defiance towards the defendants and who clearly have a substantial personal interest in the outcome of the litigation.

■ Secondly, each of the plaintiffs has heretofore been convicted of one or more serious criminal offenses. Pertinent to an inquiry as to the credibility of a witness is cross-examination concerning prior convictions of a felony or other serious crime. United States v. Frazier, 418 F.2d 854 (4th Cir. 1969); United States v. Pennix, 313 F.2d 524, 531 (4th Cir. 1963). Cross-examination of the plaintiffs in this case revealed the following:

(a) *Charles Dutton*. Although only 22, plaintiff Dutton has previously been convicted of three serious crimes. In 1968, he was convicted in a State court in Maryland of manslaughter and was sentenced to five years imprisonment. He served 22 months of that term before

being released on parole. While on parole, he was charged with possession of a deadly weapon and in 1972 was convicted of this offense, receiving a three-year prison term. In April 1973, Dutton was convicted of assaulting Sergeant Green in the Baltimore City Jail on February 24, 1971. He received an 8-year sentence for this crime.[8] (b) *Vernon Collins*. In 1972, plaintiff Collins was convicted of assault with intent to murder and was sentenced to five years imprisonment. He was likewise convicted in April 1973 of being one of the inmates who assaulted Sergeant Green on February 24, 1971, and like Dutton, he received a sentence of eight years for that offense. (c) *Conrad Whitfield*. The criminal record of plaintiff Whitfield indicates that he has twice been convicted of assault. On both occasions, custodial officers of the Baltimore City Jail were the victims. The first assault was on Sergeant Green on February 24, 1971, and Whitfield pled guilty to this offense and received a sentence of four years imprisonment. Whitfield likewise pled guilty to the charge of assaulting Jail Officer Benbow in April 1972 and received a two-year sentence for this offense. Originally, Whitfield had denied the assault on Sergeant Green. When asked on October 18, 1971 in the course of the taking of his deposition in this case whether he had assaulted Green on February 24, 1971, Whitfield denied the offense under oath, thereby committing perjury. When asked on cross-examination in this case why he had not responded truthfully to the questions directed to him at the deposition, Whitfield testified that he "did not feel obligated" to testify truthfully as to the facts when he was questioned by defendants' attorney before trial. (d) *James Dailey*. Plaintiff Dailey was convicted in 1972 of armed robbery and received a sentence of seventeen years

---

6. Expert testimony of Messrs. Goff and Mattick was admitted for the purpose of showing generally what prison practices are today considered to be undesirable and counterproductive.

7. Father Tobey had no knowledge of the November confinements nor of the segregated confinement of plaintiff Morris.

8. Dutton has filed an appeal from this conviction, which is presently pending.

imprisonment. He was not involved in the assault on Sergeant Green, and the only claim pressed by him in this case relates to his confinement in an isolation cell in November 1971. (e) *Sylvester Morris*. Presently 18 years of age, plaintiff Morris was a juvenile of 15 when he was first confined in the Baltimore City Jail on July 11, 1970, awaiting trial on charges of rape and murder. In 1971, he entered a plea of guilty to a charge of assaulting a 60-year old woman with intent to rape and received a sentence of ten years imprisonment. As a part of the plea agreement, Morris testified in the trial of the co-defendant in that case, who was later convicted of first-degree murder and sentenced to life imprisonment.

Finally, the demeanor and manner of each plaintiff while testifying in this case convinces this Court that they have little regard for the truth. Particularly during cross-examination, each of them showed a degree of hostility and evasiveness which was hardly conducive to convincing this Court of their veracity.

Although this Court cannot fully credit everything that the individual defendants said on the witness stand, nevertheless the testimony of the defendants was much more convincing than that of plaintiffs. Of course, each of the defendants also had a considerable stake in the outcome of this litigation. But unlike those of plaintiffs, their versions of the events were supported by a number of non-party witnesses and by various documents in evidence.

Defendant Schoonfield is a college graduate with considerable experience in correctional work, holds a Master's degree in correctional administration and has taught at Catonsville Community College and the University of Maryland. Warden of the Baltimore City Jail from 1961 to 1972, his term of office has been a stormy one, particularly in recent years. Because of inmate disturbances, strikes by Jail guards and other events occurring in 1971 and 1972, the administration of the Baltimore City Jail and the competency of defendant Schoonfield to be Warden became a subject of considerable public discussion in the Baltimore press. A Special Grand Jury undertook an extensive investigation of the Jail and rendered in July of 1972 a Report (which was not admitted in evidence in this case) criticizing conditions in the Jail. On September 22, 1972, the Jail Board dismissed Schoonfield as Warden. Through counsel, he immediately challenged his dismissal in an administrative appeal filed with the City Civil Service Commission. Following lengthy evidentiary hearings, a settlement was reached whereby the accusations against defendant Schoonfield were withdrawn and the charges dismissed, he was reinstated on November 9, 1972 and he thereafter immediately resigned as Warden.[9] The only question before the Court in this part of the pending case is whether on the dates in question defendant Schoonfield knowingly participated in denying these particular plaintiffs their constitutional rights and whether he accordingly should be compelled to respond in damages.

However, the events recounted hereinabove are pertinent to this Court's inquiry concerning the credibility of the witnesses. Defendant Schoonfield has quite clearly been embittered by his recent experiences. In his testimony, he was sarcastic and expressed considerable hostility and resentment toward the Legal Aid Bureau and its attorneys, whom he feels are partly responsible for the loss of his job. Nevertheless, this Court is satisfied that a substantial part of defendant Schoonfield's testimony is entitled to credit, particularly since it is supported by documentary evidence and by other non-party witnesses.

9. On September 5, 1973, defendant Schoonfield filed a civil action in this Court against the City, the Jail Board, the Union representing Jail guards, the Mayor and certain other named individuals, seeking $4,000,000 in compensatory and punitive damages. The record in this case does not indicate that the settlement foreclosed defendant Schoonfield's right to seek damages from the City and others for his alleged wrongful discharge.

Defendant Parks was employed at the Baltimore City Jail in February 1947, after having served for four years on active service with the Army. He remained in the Army Reserves for some twenty years thereafter, attaining the rank of Master Sergeant. Parks became Deputy Warden in 1961 and was Acting Warden at the time of the trial. He made an impressive witness, and his account of what occurred on the dates in question has been accorded considerable weight by the Court. Defendant Harper has been employed at the Jail for some twenty-four years. He was made Assistant Warden and thereafter Deputy Warden. Although his testimony was relatively brief, it has been credited here.

After considering all the factors in this case that bear on the credibility of the witnesses, this Court concludes that credit cannot be given to the testimony of any one of the plaintiffs in support of his particular claim for damages. Plaintiffs' versions of prison conditions and their treatment by prison guards were greatly exaggerated and were motivated by their hostility toward defendants and by their desire to further other personal ends.

### III

#### Facts [10]

At the time suit was filed in this case, all five plaintiffs had been confined in Baltimore City Jail for long periods of time awaiting trial on various charges, and they remained at the Jail for some time thereafter. Dutton was in the Jail from October 1970 until January 1972, awaiting trial on charges of violating parole and possession of a deadly weapon. Collins had been charged with assault with intent to murder and was confined in the Jail from September 1970 until February 1972. Whitfield was awaiting trial on a charge of assault and was confined in the Jail from April 1970 until December 1972. His confinement in the Baltimore City Jail was longer than that of the others because he assaulted prison guards on two different occasions and was charged with these crimes also. Dailey was in the Jail from June 1970 to July 1972 awaiting trial on armed robbery charges. Morris had been charged with rape and first degree murder and was in the Jail awaiting trial from July 1970 until September 1971.

(a) *The confinements of February and March, 1971*

On February 17, 1971, a serious riot occurred in L Section of the Baltimore City Jail. Inmates armed themselves with various weapons and seized control of the entire Section which houses maximum security prisoners. The rioting prisoners retained control of the Section from about 10:30 A.M. until about 5:00 P.M. Following negotiations between leaders of the disturbance and various City officials, the Jail Board granted certain concessions to the prisoners and further agreed to consider other demands, whereupon order was finally restored.

Included among the weapons recovered and used by inmates during the riot were hacksaw blades, broken broomsticks, spoons and other utensils fashioned into weapons. Considerable damage to L Section was done. Two thousand panes of glass were smashed, and doors and cells were broken and had to be repaired following the riot.

Plaintiff Dutton was an active participant in this riot and admitted to breaking numerous windows.[11] During the week following, he continued to defy prison authorities as he felt that the inmates' demands had not been met. Dutton, his brother and Philip Costes, one

---

10. This Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure are embodied in this Opinion, whether or not expressly so characterized.

11. Dutton testified that even though tear gas in the cell block made him physically ill, he continued to resist attempts by prison guards to regain control of the Section.

of the original plaintiffs in this action, wrote a letter to Warden Schoonfield shortly after the riot in which they represented themselves to be leaders of "Revolutionary Peoples' Party #III" and members of the "Central Committee of the Committee to Free Political Prisoners." They complained that their mail was being intercepted, referred to "the revolutionary violence that occurred on the 17th" and charged that the Warden had lied to the Jail Board and hidden his "Fascist penal activities" from the Board. Calling the Warden "corrupt" and "a sick man" and Jail guards his "running dogs" and "pawns", the letter stated that the Warden's actions were "not enough to put down the revolutionary spirit inside this jail."

During the week after the riot, tension remained high throughout the Jail and particularly on L Section. On the morning of February 24, 1971, Sgt. Joseph L. Green, who had been a Correctional Officer for over ten years, was escorting two inmates to take showers when six prisoners attacked him. This Court finds that plaintiffs Dutton, Collins and Whitfield were involved in this attack. Green was lured behind a grille, and an attempt was made to take him as a hostage and regain control of the Section. He was beaten about the head, face and eyes and recalls that one of his assailants yelled, "Knock him out; kill him if you have to." Before lapsing into unconsciousness, Green remembered hearing other officers call for help and the response from one of his attackers to the effect that "If you come down here, we'll kill him." The evidence indicates that this vicious attack was unprovoked and was made at a time when Sgt. Green was performing his regularly assigned duties.

Shortly thereafter, other guards arrived and were able to subdue Sgt. Green's attackers by means of fire hoses and chemical mace. Six inmates, including plaintiffs Dutton, Collins and Whitfield, were forcibly subdued and were immediately taken to Section I, the isolation section of the Jail, where, as punishment, they remained for some thirteen days.

There are eight cells in Section I, but on February 24, 1971, one of them was inoperative and was not used to house prisoners being punished. One of the remaining seven cells was a strip cell, without fixtures or furnishings. This strip cell had a small hole in the floor used for the elimination of bodily wastes and flushed from outside the cell. The other six cells in Section I are equipped with a combination toilet-sink, and the toilets in these cells can be flushed from within.

Between February 24 and March 9, 1971, there were a total of some twelve or thirteen inmates confined in the seven operative cells in Section I. The confinement of such a large number of prisoners at one time in these cells for punitive reasons was unusual but had resulted from the riot and its aftermath. Ordinarily, a prisoner being punished would be placed in one of these alone, but because of the large number confined in Section I during this period, there were two and for short periods of time three men to a cell during the thirteen days in question.

The evidence indicates that these isolation cells are usually kept reasonably clean.[12] Each occupant is required to clean his own cell, and other inmates from other Sections are assigned to clean the corridors and areas outside the cells. Usually, bedding, toilet paper, articles of personal hygiene and regular Jail food on trays are supplied to inmates confined in the Section I cells. Opportunities to take showers are regularly afforded, and guards periodically check each cell to determine if medical attention is required by the inmate confined therein. Inmates confined in Sec-

---

12. Father Tobey, who regularly visited the isolation area, testified that he had never observed conditions in these cells to be as bad as on the two occasions that he went there in February and March, 1971.

tion I cells are afforded the same medical treatment, when needed, as are other prisoners in the Jail.

During the period when these three plaintiffs were being subdued on February 24 and throughout the entire time that they remained in segregated confinement, they continued the protests that had commenced with the rioting on February 17. They defiantly refused to obey orders given by the guards. Before being placed in the isolation cells, they had been stripped by prison guards, searched for weapons and ordered to put their clothes back on. Plaintiffs refused, telling the guards that since they had removed the clothes, they, the guards, should put them back on. Plaintiffs' clothes were finally left outside their cells, and plaintiffs by their own choice remained naked in their cells until they tired of this form of protest and at a later time recovered and replaced their clothing.

The accepted policy of the Baltimore City Jail at this time was to place prisoners for punitive reasons in isolation cells for no more than three days to calm down those so confined and then return them to the Section to which they were regularly assigned. But these plaintiffs refused to calm down, and several of them even refused to leave the Section I area when invited to do so. During the thirteen-day period after February 24, 1971, plaintiffs remained enraged and hostile, verbally abusing prison guards and other inmates who ventured by outside their cells. Whenever a guard would appear, he was subjected to a torrent of invective.[13] Furthermore, food and human waste were thrown at guards and at other inmates.[14] Plaintiffs not only refused to clean

their own cells but would not permit other inmates to clean the outside areaways when assigned to do so. When they were originally confined in Section I cells, plaintiffs were given trays and the same food supplied other inmates at the Jail. When food, trash and trays were thrown out of the cells by the plaintiffs, it was then ordered that they be fed with sandwiches. Showers were offered to plaintiffs but were refused by them.[15]

As further acts of defiance, plaintiffs on occasion would clog the toilet facilities located in their cells, causing flooding when the toilets were flushed. The water in such cells would be turned off on such occasions, and plaintiffs were then given drinking water in paper cups. Bedding and toilet paper was torn and strewn about the cells and thrown into the hallways. With the toilets occasionally stopped up, there was a foul odor that pervaded Section I during this confinement.

On February 28, Father Tobey visited I Section and observed plaintiffs Collins, Whitfield and Dutton in the isolation cells there. He testified that the cells and areaways were dirty and covered with trash and food, that there was a generally foul odor throughout the Section and that the toilets were backed up and would not flush. On that occasion, he did not report what he saw to Warden Schoonfield but did complain to Captain Wyatt concerning what he observed.

About a week later, Father Tobey returned to the area, and when he noted that conditions were about the same, he went to the Warden and told him what he had seen. Defendant Schoonfield called in defendant Harper and several

---

13. Captain Markwordt testified that when he appeared on the scene shortly after the confinements commenced, one of the plaintiffs said: "Here comes the honky m–f–." When he offered one of the plaintiffs medical attention, he was told to 'go f___ yourself."

14. The throwing of human waste by inmates at guards has been noted in cases similar to this as a means of protest by recalcitrant pris-

oners. Mitchell v. Boslow, 357 F.Supp. 199 202 (D.Md.1973).

15. Plaintiffs admit that they were offered showers but claim that this happened on only one occasion. They admit that they refused on such occasion to shower because they were being taken to court for arraignment and they wished to show the judge that they were being mistreated at the Jail.

other guards and, after hearing their report, ordered that all men confined in the Section I cells should be immediately returned to their regular Sections and that the isolation cells should be cleaned up at once. Plaintiffs were accordingly returned to L Section on March 9, 1971, having spent thirteen days in segregated confinement.

(b) *The confinements of November 1971*

On November 18, 1971, plaintiff Dailey was found in an unauthorized area in a rear yard of the Jail. A punishment slip was entered in the Jail records, and Dailey was ordered confined in an isolation cell. That same day there was a disturbance and confrontation between inmates in L East and those in L West where plaintiffs were confined. A messy condition was observed by one of the guards in the L West corridors, but when inmates from L East were sent to clean up the mess, they were prevented from doing so by some L West inmates who threw water and urine at the prisoners from L East. Whitfield and several others were charged with this offense and sent to isolation. The next day, November 19, 1971, there were similar disturbances caused by Dutton and Collins, who were charged with throwing urine at a guard and ordered confined in isolation cells. All four plaintiffs were released some five days later on November 23, 1971.

While confined in isolation in November 1971, plaintiffs Whitfield, Dutton, Collins and Dailey continued the disruptive tactics and acts of protest employed during the February and March confinements. After Collins was put in isolation, Deputy Parks went to interview him to determine when he might be released. The leader in the demonstration occurring on November 19, Collins became very hostile and stated that he did not want to be moved. The Daily Work Sheet for November 20, 1971 contained the following notation:

"Note: At 9:00 p. m., isolation was cleaned by Officer Vance—at 9:10 p. m. when Officer Vance returned to isolation to give out the evening medication, trash, paper, and water or urine were all over the floor— This area was recleaned at 9:30 p. m."

Captain Harrison,[16] in his report to defendants Parks and Harper, added this note:

"This is the facts, this was seen by myself—These men are human beings but are acting like animals."

On November 22, plaintiffs stopped their disruptive tactics and, according to defendant Parks, "calmed down." They were released the next day from isolation. On the morning plaintiffs were returned to L West, 23 inmates of L East submitted a petition to Deputy Warden Parks, requesting transfer to another Section for their protection. Such petition, dated November 23, 1971, was to the following effect:

"This petition has been drawn to enlighten you of certain threats upon lives of residents of L–E. When Vernon Collins, James Dailey, Conrad Whitfield, Cheyenne Carter, Charles Dutton, Richard Pace came out of isolation this A. M. they said the first chance they got (and they will get a chance) that they were going to kill the residents of L–E.

"We are here for our own protection and I cannot think of any place worst suited for protective measures then next to the most 'Hard Boiled' inmates in the institution. These people have nothing to lose, the majority of them are never going to see the outside again, and no one here wants to get a Murder charge in defense of our lives.

"For the above mentioned reasons we would like to move back to R section, where we feel that our safety would be insured. You are also aware of various assaults that have taken

---

16. Captain Harrison testified in this case. A Custodial Officer at the Jail for some 25 years, it was his assignment to check the isolation area on a daily basis.

place so far. To prevent any further incidents we again state that we would like to be moved back to R–Section."

The evidence indicates that there was some substance to the concern expressed by these 23 prisoners. Inmates confined in L West had devised a means of entering L East through the showers. Acts of sodomy and other assaults had been committed by prisoners from L West, and plaintiff Collins was positively identified as one of the perpetrators of these offenses.[17] According to the Jail's Daily Work Sheet for November 23, 1971, all inmates from L East were that day removed to R Section as they had requested, in order to protect them from threatened assaults by plaintiffs following their release from isolation.

### (c) *The confinement of plaintiff Morris*

Plaintiff Morris presented a special problem to Jail officials when he was first sent to the institution in July 1970. Only 15 years of age at the time, Morris had been charged as an adult with participating in the rape and murder of a 60-year old woman. Although he was originally placed in Section J, the juvenile Section, such an arrangement proved to be unsatisfactory as Morris was smaller than the other juveniles, was very young looking and was subjected to homosexual attacks. Furthermore, Morris persistently violated prison rules and was constantly being disciplined.[18]

In December 1970, Morris refused to eat breakfast, had an altercation with a guard and threatened him with a tray. For this offense, he was confined in isolation for three days. When he was released from isolation, he was sent to K Section where he remained for several months. This confinement was for Morris's own protection, and although he was somewhat more restricted than other juveniles in the Jail, Morris was not during this period subjected to the punitive conditions of Section I. During this period, Morris became the protege or mascot of defendant Parks, accompanying Parks on his tours through the Jail and performing various duties at Parks' direction. On cross-examination, Morris admitted that Parks granted him privileges not accorded other inmates.

Subsequently, Morris was confined in A Section for about thirty days, again to protect him from other inmates. On A Section, his privileges were about the same as those accorded other juveniles, including radio, television and commissary rights.

## IV

### *Conclusions*

### (a) *Excessive force*

Plaintiffs Collins, Whitfield and Dutton first contend that they were physically abused on February 24, 1971 following the assault on Sgt. Green and that excessive force was used in subduing and removing them to Section I. The evidence here does not support this claim.

 With plaintiffs and other inmates subjecting Sgt. Green to a brutal beating on February 24, the use of mace and a fire hose by prison guards was entirely justified. Only a week before, another guard, Sgt. Gerhardt, had been attacked by inmates on L Section and injured. While prison officials must be concerned with the constitutional rights of inmates, they are likewise charged with the very serious responsibility of maintaining order and protecting the lives of employees of the institution. In Landman v. Peyton, 370 F.2d 135 (4th Cir. 1966), the District Court had found that the use of tear gas in the Virginia State Penitentiary on twelve or fifteen

---

17. Collins did not deny that he had gained access to L East through the showers. When asked on cross-examination whether this was true, he replied, "No comment."

18. He is presently confined in the Maryland Correctional Institution and continues to violate prison rules, having been cited for disciplinary violations on 18 different occasions since he was sent there.

occasions in the course of a year was a constitutional and legitimate exercise of disciplinary authority by prison officials. On appeal, the Fourth Circuit did not disturb this finding.[19]

The plaintiffs in this case were being held in the maximum security Section because of their past records and their assaultive natures. Each of them was known for acts of violence committed within the Jail. Dutton was one of the leaders of the riot the week before. Collins had previously assaulted another inmate in November 1970.[20] And Whitfield had assaulted a white inmate when he had been confined in the Jail on a previous occasion in 1967.[21]

■ In dealing with rioting prisoners known to be violent in nature, the Jail guards were justified in using both physical force and mechanical means to subdue the recalcitrants. Plaintiffs actively resisted efforts of the prison guards to remove them to Section I and continued their resistance and protests after their removal to segregated confinement by throwing anything they could put their hands on at guards and other inmates. What might have been excessive force under other circumstances was justified by the facts here, in particular by plaintiffs' refusal to submit to the guards' attempts to rescue Sgt. Green and restore order on L Section. Furthermore, Jail guards were properly exercising their authority here when they stripped plaintiffs and searched them for weapons.

(b) *Cruel and unusual punishment*

■ When plaintiffs Collins, Whitfield and Dutton were sent to Section I of the Jail as punishment on February 24, 1971, they were not put in solitary confinement. Plaintiffs claim that on this occasion their constitutional rights were violated because they and four or five others were crowded in one cell under inhumane conditions.

According to Jail records, there were usually thirteen and on occasion twelve inmates confined in I Section between February 24, 1971 and March 9, 1971. As one of the strip cells was inoperative and not used in that period, these thirteen prisoners were confined in seven different cells. This Court finds from the credible evidence that there were no more than two inmates in each cell in Section I for all of the thirteen-day period except for a short time after the attack on Sgt. Green, or for short periods when prisoners were doubled up so that cells could be cleaned.[22] Because of the original riot and the attempt to renew it one week later, the I Section cells were unusually crowded during the period in question. This Court finds that the placing of two inmates in one cell during this period was justified by the emergency then existing at the Jail.

In November, the four plaintiffs involved were confined in separate isolation cells. On this occasion, the plaintiffs remained in isolation for a period of five days and they claim damages because of their solitary confinement.

---

19. See also Poindexter v. Woodson, 357 F. Supp. 443, 455–457 (D.Kan.1973), where the Court approved a much broader and more indiscriminate use of tear gas and fire hoses than here in the quelling of a prison uprising.

20. Before the November confinements, Collins had committed additional violent acts within the Jail. In June 1971, as a form of protest, he accumulated trash outside his cell and set a fire. That same month, he was accused of a sexual assault on a white inmate by the name of Perry. On cross-examination,

Collins denied the sex act but admitted the assault on Perry.

21. In November 1971, Whitfield made threatening remarks to Sgt. Green in an attempt to induce him not to testify in the pending criminal case in which Whitfield had been charged as one of the assailants.

22. This Court accepts the testimony of Captain Harrison that there were not five men in a cell during the period in question, except for brief periods of time when the men may have been doubled up for the purpose of cleaning individual cells.

This Court concludes that during these two periods of segregated or isolated confinement, plaintiffs were not subjected to cruel and unusual punishment as that concept has recently been interpreted by federal courts in cases involving prisoners in State institutions. Segregated or solitary confinement does not in itself violate the Constitution. Bundy v. Cannon, *supra*, 328 F.Supp. at 171; Sostre v. McGinnis, *supra*, 442 F. 2d at 178, 192; Landman v. Peyton, 370 F.2d 135 (4th Cir. 1966); Courtney v. Bishop, 409 F.2d 1185 (8th Cir. 1969), cert. den., 396 U.S. 915, 90 S.Ct. 235, 24 L.Ed.2d 192 (1969); Graham v. Willingham, 384 F.2d 367 (10th Cir. 1967); United States ex rel. Knight v. Ragen, 337 F.2d 425 (7th Cir. 1964), cert. den., 380 U.S. 985, 85 S.Ct. 1355, 14 L.Ed.2d 277 (1965); Ford v. Board of Managers of New Jersey State Prison, 407 F.2d 937, 940 (3d Cir. 1969). Punishment similar to segregated or isolated confinement is probably used in almost every jurisdiction in this country and in Federal prisons. Sostre v. McGinnis, *supra*, 442 F.2d at 192. Under Federal practice, prisoners are retained in solitary for as long as necessary and sometimes indefinitely, and willful refusal to obey an order or demonstrated defiance of personnel acting in line of duty may constitute sufficient basis for placing an inmate in segregation. 442 F.2d at 192.

Wright v. McMann, 387 F.2d 519 (2d Cir. 1967) involved two separate strip cell incarcerations of twenty-one and thirty-three days. In *Sostre*, the plaintiff was confined in punitive segregation for over twelve months, and punishment was exacted because of a prisoner's militant political ideas and his effort to resort to the courts for relief. Here, the thirteen-day confinement of the plaintiffs in February and March of 1971 was at the outset punishment for a brutal assault on a prison guard and was extended because of continuing violations of prison discipline while plaintiffs were so confined. The November confinement, although in separate isolation cells, lasted only five days, was ordered because of specific breaches of prison regulations, and was extended beyond the usual three-day period because of continuing breaches of prison rules.

In Knuckles v. Prasse, 302 F.Supp. 1036, 1060 (E.D.Pa.1969), Judge Higginbotham found nothing unreasonable about the practice in Pennsylvania prisons of keeping prisoners charged with assault in punitive segregation until their trials. At page 1061, the Court stated:

"While in segregation plaintiffs were guilty of numerous and continuing misconducts. Penology experts testified that misconducts have a legitimate bearing on how long a prisoner is to be kept in segregation. Prison authorities are responsible for the security and stability of the entire institution, and when individual prisoners pose a threat to security or stability, when by their conduct prisoners demonstrate that they are not ready or able to adjust to congregated prison life, it seems well within the discretion of prison administrators to keep such prisoners for long periods —some experts were willing to say indefinite periods—of time in segregation."

Plaintiffs claim that they were subjected to inhumane and unconstitutional conditions during their segregated or isolated confinements. The evidence indicates that conditions in Section I, though harsh, did not violate constitutional standards on February 24, 1971. There was adequate heat, light and air in the cells in question which were reasonably clean and free of odor when plaintiffs and the other inmates being punished entered them. Jail rules require regular, periodic visits of inmates in isolation, and the evidence discloses that guards complied, or attempted to comply, with this Rule during the periods involved here. Although one or more of the plaintiffs may have spent a brief period of time at the outset in the one strip cell, during most of the thirteen days they were in the six other

cells. Running water and toilet facilities were adequate at first, but at later periods in the confinements, the water was turned off from time to time because of plaintiffs' misconduct. Items of personal hygiene were available and would have been supplied had plaintiffs not greeted guards with verbal abuse and thrown objects whenever guards appeared to check on the inmates in Section I. During the thirteen-day period in question, plaintiffs left their cells on several occasions, including a visit to court and interviews with attorneys.

Although plaintiffs were stripped and searched when first placed in the cells, their clothing was available to them from the outset. If, as they claim, plaintiffs were in fact naked when they entered the Section I cells, it was because they refused to put their clothes on. Regular food and minimal bedding were supplied to plaintiffs at the outset, but when bedding was torn up and food thrown about, plaintiffs were fed by means of sandwiches [23] and their bedding was not replaced. Showers were regularly offered to plaintiffs but declined,[24] as was medical treatment. From the evidence, this Court finds that conditions in the cells were indeed sub-standard during the latter part of plaintiffs' segregated confinement in March 1971. This Court further finds that such conditions were caused by plaintiffs themselves and that defendants cannot be required to respond in damages for any denial of plaintiffs' rights.

Conditions in the isolation cells in November 1971 were better than in February and March, 1971. There were only some seven prisoners confined in the Section I cells during the later period.[25] As plaintiffs' protests while in solitary on this occasion were not as violent nor as extended as during the earlier period, the cells never reached the sub-standard conditions which resulted from plaintiffs' acts in February and March.

As a number of federal courts have recognized, there are limits to the rigor and discomfort of close confinement which a State may not constitutionally exceed. Holt v. Sarver, 300 F.Supp. 825, 833 (E.D.Ark.1969). But what the Court is called upon to determine in this case is the extent to which a prisoner's recalcitrance and continued resistance may affect his right to recover damages under § 1983 for confinement under sub-standard conditions. On the one hand, as federal courts have so clearly spelled out in recent years, a prisoner does not surrender his constitutional rights once he is placed behind bars. On the other hand, prison officials must be possessed with all necessary power and authority to guarantee the security of their institution and the physical well-being of inmates and guards confined or working there. These two principles collide in a decisive manner where, as here, a prisoner by his own wilful acts contributes to the surrender of rights which he would otherwise enjoy. To determine what rights follow an inmate into prison involves a process of weighing and balancing conflicting interests, including the practical necessities of managing and administering a penal community. Gittlemacker v. Prasse, 428 F.2d 1, 4 (3d Cir. 1970).

A prisoner subjected under other circumstances to the kind and extent of the confinements imposed on the plaintiffs here might well be entitled to recover damages from prison officials. But the plaintiffs in this case were confirmed

---

23. There is no evidence in this case that food was denied plaintiffs as a form of punishment.

24. In refusing to come out of their Section I cells on February 28, 1971 to take showers, the inmates confined there shouted at the guards, "Power to the people, the Hell with you Fascist pigs." See Daily Work Sheet of February 28, 1971, Plaintiffs' Exhibit No. 42.

25. The evidence does not indicate that any one of the four plaintiffs involved was confined in a strip cell in November.

recalcitrants, filled with rage, defiant of authority and committed to acts of protest to express their feelings. It is not for the Court in this case to concern itself with the sociological or psychological factors underlying plaintiffs' defiant attitudes and actions.[26] Suffice it to say, whatever might be the basic environmental or other reasons for the conduct of these young, black offenders, while in the Baltimore City Jail, defendants are in no way to blame, nor as a matter of constitutional law should they be required to undertake to solve the chicken-and-egg question whether plaintiffs' defiant acts caused their confinements or vice versa. These prison officials, during the periods involved here, were doing no more than seeking to carry out the difficult responsibilities with which they are charged in running the Baltimore City Jail. In the light of the occurrences which the evidence in this case discloses, defendants were justified in exacting punishment suitable to the particular offenses committed and in extending the punishment imposed for short periods of time when plaintiffs continued to violate Jail rules while in segregated or solitary confinement.[27]

(c) *Punishment for the exercise of constitutional rights*

■ Plaintiffs argue that they were punished for exercising their constitutional right to criticize the Warden and the conditions of their confinement. The credible evidence in this case does not support this claim. This Court finds that plaintiffs Collins, Whitfield and Dutton were originally punished in February 1971 for a savage and unprovoked attack on a prison guard. Their punishment was extended, not because of criticism of defendants and Jail conditions but because plaintiffs continued to violate Jail rules while in segregated confinement. Prisoners indeed have a right even while confined to express their beliefs concerning the conditions of their confinement. Sostre v. McGinnis, *supra,* 442 F.2d at 202; Collins v. Schoonfield, *supra,* 344 F.Supp. at 270. Prisoners have no right to curse and verbally abuse guards, nor throw food, trash and human waste at them, nor engage in other forms of protest which pose a clear and present danger of violence and disorder. Collins v. Schoonfield, *supra,* at 270.

The total punishment imposed in February and March, 1971, namely thirteen days confinement in segregation, was not excessive. Had plaintiffs, while in such segregation, not continued disruptive tactics and acts of protest in further breach of Jail rules, they would have been released from their Section I confinements many days before March 9, 1971.

In November 1971, plaintiffs Collins, Whitfield, Dutton and Dailey were each punished for specific violations of Jail rules, not for the exercise of their First Amendment rights. Their confinement in isolation for five days was not excessive, and when they stopped throwing food, trash and waste from their cells, they were released from isolation and returned to L Section.

(d) *The claims of plaintiff Morris*

■ Plaintiff Morris seeks damages (1) for his confinement in isolation for three days in December 1970, (2) for his restricted confinement in Section K in January and February 1971 and (3)

---

26. In the damages aspect of a case such as this one, the natures of and resistant acts of the individual plaintiffs become quite significant. In the portion of the case tried before Judge Kaufman, the focus was quite different. General conditions and practices at the Jail were there challenged, and the claims were not, as here, primarily concerned with the particular events which led to the particular punishments in question, including necessary extensions thereof.

27. Plaintiffs have also argued that the punishments and other alleged deprivations were racially motivated. The evidence in this case does not support this claim.

for his restricted confinement in Section A subsequent to February 1971. This Court finds that Morris has not sustained his burden of proving that his constitutional rights were violated on any of those occasions.

The punishment in December 1970 was for a specific violation of Jail Rules and lasted for only three days, which was the usual period of such punitive confinement absent further misconduct. Morris admitted that he was let out on one occasion during this three-day period to consult his attorney. No extraordinary conditions of confinement were endured by Morris during this stay in solitary, and this Court finds that his constitutional rights were not then infringed.[28]

Morris's later confinements in Section K and Section A were not punitive in nature. Defendants had two choices: (1) putting Morris in Section J with other juveniles where, because of his age and small size, he might be subjected to physical abuse or (2) putting Morris in protective custody where some of his privileges would be withdrawn but where he would be afforded adequate protection while awaiting trial. Not only was there concern that Morris would be sexually abused while in the Jail, but also there was concern as to his safety because he was scheduled to be a witness against the co-defendant in the rape and murder case then pending.

This Court finds that although Morris did not have the same privileges as did other juvenile inmates while he was confined in Sections K and A, he was not subjected to cruel and unusual punishment during the period in ques-

tion. Even if the deprivations suffered by Morris were found to be constitutional ones, it is clear that defendants acted in a good faith effort to protect this young plaintiff from harm and in any event would not be required to respond personally for damages. Skinner v. Spellman, 480 F.2d 539 (4th Cir. 1973).

### (e) *Punishment of pre-trial detainees*

Plaintiffs contend that as pre-trial detainees they are subject to fewer restrictions and punishments than prisoners confined after convictions. It is of course self-evident that the Constitution does not authorize the treatment of a pre-trial detainee as a convicted prisoner. Jones v. Wittenberg, 323 F. Supp. 93, 100 (N.D.Ohio 1971); Tyler v. Ciccone, 299 F.Supp. 684 (W.D.Mo. 1969). But, prison officials quite obviously must have full power and authority to discipline pre-trial as well as post-trial detainees in order to maintain the order and security of an institution. Collins v. Schoonfield, *supra*, 344 F. Supp. at 265, 269;[29] Jones v. Wittenberg, 330 F.Supp. 707, 720 (N.D.Ohio 1971). The *Jones* case, relied upon by plaintiffs, approved the use of solitary confinement as a disciplinary measure for those physically violent pre-trial detainees whose behavior endangers the health and safety of other inmates. Similarly, inmates who, like plaintiffs, endanger the lives and safety of prison guards or violate Jail rules are subject to discipline and punishment, even though they may be pre-trial detainees.

Undoubtedly, the lengthy period of pre-trial confinement endured by the plaintiffs increased their frustrations and fueled the hostility that they exhibit-

---

28. This Court does not accept Morris's testimony that he was gassed and maced from time to time while in solitary or segregated confinement, causing his skin to peel and other medical problems.

29. In his Opinion in this case, Judge Kaufman noted utterances and behavior of certain

of the plaintiffs before him which led to his attaching credence to the testimony of Jail officials as to verbal and other abuse directed at them, "abuse which, from a pre-trial detainee, might well lead to such disrespect and chaos within the institution so as to endanger its security." (344 F.Supp. at 273).

ed towards Jail authorities. All of the plaintiffs were held in the Jail for many months awaiting trial for serious offenses.[30] During this period of confinement, they were in a kind of limbo, deemed innocent by the law but anxiously facing lengthy prison terms if convicted.

▪ The delays in question are inexcusable and reflect adversely on the administration of justice in the criminal courts of Baltimore City. But defendants cannot in any way be held responsible for unjustifiable delays caused by a crowded criminal docket. Defendants' assigned duties were to maintain order in a tense and hostile atmosphere in an overly-crowded institution designed to house mainly pre-trial detainees. Because of the heightened tensions and frustrations occasioned by plaintiffs' lengthy pre-trial detention, defendants faced problems of greater magnitude than do prison authorities in charge of institutions which house persons already convicted of crimes.

(f) *Due process of law*

▪ Among other constitutional rights enjoyed by prisoners during their incarceration is the right to procedural due process. Recent decisions in this and other courts recognize that before a prisoner can be punished for substantial infractions, he must be afforded at least adequate notice of the alleged misconduct, an opportunity to reply to the charges against him and a relatively objective and impartial body to determine whether misconduct has occurred and to assess appropriate punishment. Bundy v. Cannon, *supra*, 328 F.Supp. at 172–173;[31] Collins v. Schoonfield, *supra*, 344 F.Supp. at 274. Actual trial type procedures are not required in prison disciplinary hearings but only a mini-

mally fair and rational inquiry into the charges and the circumstances. Wright v. McMann, 460 F.2d 126, 130 (2d Cir. 1972).

Before December 15, 1971, no such procedures were followed at the Baltimore City Jail. On that date, the Jail Board adopted a new policy requiring the establishment of various types of due process procedures within the institution. In his Opinion filed on May 15, 1972 and in the subsequent Decrees entered in this case, Judge Kaufman was more explicit and detailed the procedures which Jail officials should follow before inmates were disciplined. Collins v. Schoonfield, *supra*, 344 F.Supp. at 274.

The events involved here all occurred before December 15, 1971. It is quite clear from the evidence that defendants in punishing these plaintiffs did not comply with the due process requirements which have been recognized in recent cases as constitutional minima. Only the most rudimentary procedures were followed by defendants here. When a prisoner was placed in solitary or segregated confinement, an officer of the Jail would visit the inmate in Section I, advise him of the reason for the confinement and give him an opportunity to respond. This practice was followed, or attempted to be followed, when Morris was punished in December 1970 and when the other plaintiffs were confined in February and November 1971. On the latter occasions, plaintiffs' verbal and physical protests prevented Jail officers from communicating with them and advising them of the particular charges involved. In any event, it is clear that the procedures followed or attempted were inadequate under today's standards, particularly since there was no opportunity afforded an inmate to have a relatively impartial hearing.

---

30. The time that plaintiffs Dutton, Collins and Whitfield spent in the Jail before their trials was extended by their assault on Sgt. Green and by the additional criminal charges that resulted.

31. The *Bundy* opinion was filed on May 26, 1971. It dealt with procedures in State correctional institutions administered by the State Division of Correction. The City Jail, which is under the jurisdiction of the Baltimore City Jail Board, was not a party to that suit.

However, it is further clear from the evidence that what was done or attempted in this case had been standard operating procedure at the Baltimore City Jail for many years when an inmate as punishment was put in segregated or solitary confinement. At the time of the matters in suit, defendants, Jail guards and inmates were subject to the rules and regulations contained in the Official Jail Manual,[32] approved by the Baltimore City Jail Board. Some 112 pages in length, this Manual contains detailed provisions concerning the operation of the Jail and the responsibilities of those confined and working therein.[33] Nowhere in the Manual are there any provisions requiring the Warden and the other defendants to afford prisoners specific due process rights before being placed in segregated or isolated confinement.

This Court finds that defendants, in not affording plaintiffs their due process rights before punishing them, acted in a reasonable good faith reliance on what was standard operating procedure at the Baltimore City Jail for many years. Accordingly, defendants cannot be required to respond personally for damages. Skinner v. Spellman, 480 F.2d 539 (4th Cir. 1973); Hill v. Rowland, 474 F.2d 1374 (4th Cir. 1973); Eslinger v. Thomas, 476 F.2d 225 (4th Cir. 1973); Landman v. Royster, 354 F. Supp. 1302, 1317 (E.D.Va.1973); see Bennett ` v. Gravelle, 323 F.Supp. 203, 214 (D.Md.1971), aff'd, 451 F.2d 1011 (4th Cir. 1971). As the Court observed in Jones v. Wittenberg, supra, 330 F. Supp. at 722:

> "It does not seem equitable to single out these defendants and mulct them in damages for continuing practices which are commonplace, and of very ancient usage."

## V

### *Judgment*

For the reasons stated, judgment is hereby entered in favor of the defendants, with costs.[34]

---

32. The title of this publication is "Baltimore City Jail Official Manual for Rules—Regulations—Responsibilities and Manual of Procedure."

33. The primary responsibility of a Jail Officer is stated as maintaining custody in such a way as to prevent escape. (Manual, page 2)

34. Each of the individual defendants has also contended that he is not liable in damages because he did not participate in some or all of the alleged deprivations and did not have knowledge of some or all of the acts in question. Because of the Court's conclusions as to the other issues in the case, it is not necessary to determine whether a particular defendant knowingly participated in an alleged unconstitutional act.